# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re Viatris Inc. 2025 Securities Litigation | Civil Action No. 2:25-cv-00466-CBB |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

Gregory L. Watts (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
95 S. State Street, Suite 1000
Salt Lake City, UT  84111
Telephone: (801) 401-8510
gwatts@wsgr.com

Nina F. Locker (*pro hac vice*)
Evan L. Seite (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 493-9300
nlocker@wsgr.com
eseite@wsgr.com

Sheryl Shapiro Bassin (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
31 West 52nd Street, Fifth Floor
New York, New York 10019
Telephone: (212) 999-5800
sbassin@wsgr.com

*(Additional counsel on signature page)*

*Counsel for Defendants Viatris Inc., Scott Andrew
Smith, Theodora Mistras, and Corinne Le Goff*

**TABLE OF CONTENTS**

**Pages**

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 2

ARGUMENT ..................................................................................................................... 8

I.    THE APPLICABLE PLEADING STANDARDS GOVERNING THIS CASE ................ 8

II.   PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE STATEMENT ........................... 9

     A.    Viatris' Pre-Warning Letter Statements Are Not Actionable .............................. 10

          1.    Viatris Was Not In "Violation" of cGMP Before the Warning
                Letter ...................................................................................................... 10

          2.    None of the Challenged Pre-Warning Letter Statements Is
                Actionable .............................................................................................. 14

     B.    Viatris' Post-Warning Letter Statements Are Not Actionable ............................ 19

III.  THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF
      SCIENTER ................................................................................................................ 25

CONCLUSION ................................................................................................................. 30

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)...............................................................................................12

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022) ...........................................................................................12

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004)..............................................................................................8

*Cambridge Ret. Sys. v. MEDNAX, Inc.*,
  2019 WL 4893029 (S.D. Fla. Oct. 3, 2019).....................................................................18

*Carvelli v. Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019) ......................................................................................17

*City of Brockton Ret. Sys. v. Avon Prod., Inc.*,
  2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)..................................................................20

*City of Edinburgh Council v. Pfizer, Inc.*,
  754 F.3d 159 (3d Cir. 2014)..............................................................................16, 22, 30

*City of Livonia Emps.' Ret. Sys. v. Boeing Co.*,
  711 F.3d 754 (7th Cir. 2013) ..........................................................................................25

*City of Pontiac Gen. Emps. Ret. Sys. v. Stryker Corp.*,
  865 F. Supp. 2d 811 (W.D. Mich. 2012) ...................................................................11, 29

*City of Warren Police and Fire Ret. Sys. v. Prudential Fin., Inc.*,
  70 F.4th 668 (3d Cir. 2023) ............................................................................................18

*Epstein v. Washington Energy Co.*,
  83 F.3d 1136 (9th Cir. 1996) ..........................................................................................24

*Fin. Acquisition Partners LP v. Blackwell*,
  440 F.3d 278 (5th Cir. 2006) ..........................................................................................12

*Finocchiaro v. NQ Mobile, Inc.*,
  2018 WL 1217728 (S.D.N.Y. Feb. 27, 2018)...................................................................18

*Fire & Police Pen. Ass'n of Colo. v. Abiomed, Inc.*,
  778 F.3d 228 (1st Cir. 2015).....................................................................................11, 26

*Gallagher v. Abbott Labs.*,
  269 F.3d 806 (7th Cir. 2001) ..........................................................................................20

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004)............................................................................................26

*Habelt v. iRhythm Techs., Inc.*,
　2022 WL 971580 (N.D. Cal. Mar. 31, 2022),
　*cert. denied*, 145 S. Ct. 144 (2024) .................................................................................24

*Hills v. BioXcel Therapeutics, Inc.*,
　2024 WL 3374145 (D. Conn. July 11, 2024) ....................................................................30

*Hoey v. Insmed Inc.*,
　2018 WL 902266 (D.N.J. Feb. 15, 2018) ..........................................................................28

*Holland v. Standley*,
　2025 WL 2434230 (E.D. Pa. Aug. 21, 2025) .....................................................................23

*In re Adolor Corp. Sec. Litig.*,
　616 F. Supp. 2d 551 (E.D. Pa. 2009) .................................................................................25

*In re Advanta Corp. Sec. Litig.*,
　180 F.3d 525 (3d Cir. 1999).............................................................................................28

*In re Amarin Corp. PLC Sec. Litig.*,
　2015 WL 3954190 (D.N.J. June 29, 2015) ........................................................................21

*In re Amarin Corp. PLC Sec. Litig.*,
　2021 WL 1171669 (D.N.J. Mar. 29, 2021),
　*aff'd*, 2022 WL 2128560 (3d Cir. June 14, 2022).............................................................28

*In re Amarin Corp. PLC Sec. Litig.*,
　689 F. App'x 124 (3d Cir. 2017) ........................................................................................2

*In re Campbell Soup Sec. Litig.*,
　2020 WL 7022655 (D.N.J. Nov. 30, 2020) .......................................................................26

*In re Checkpoint Therapeutics Sec. Litig.*,
　2025 WL 1434400 (S.D.N.Y. May 19, 2025) ........................................................10, 11, 30

*In re Columbia Labs., Inc. Sec. Litig.*,
　2013 WL 10914123 (D.N.J. June 11, 2013) ........................................................................9

*In re Digital Island Sec. Litig.*,
　357 F.3d 322 (3d Cir. 2004)..............................................................................................25

*In re Discovery Labs. Sec. Litig.*,
　2007 WL 789432 (E.D. Pa. Mar. 15, 2007),
　*aff'd*, 276 F. App'x 154 (3d Cir. 2008)........................................................................12, 13

*In re Egalet Corp. Sec. Litig.*,
　340 F. Supp. 3d 479 (E.D. Pa. Aug. 2, 2018), *aff'd sub nom. Spizzirri v.
　Zyla Life Scis.*, 802 F. App'x 738 (3d Cir. 2020).............................................................12

*In re Exscientia PLC Sec. Litig.*,
　2025 WL 2886489 (D.N.J. Oct. 10, 2025).........................................................................17

*In re Exxon Mobil Corp. Sec. Litig.*,
    387 F. Supp. 2d 407 (D.N.J. 2005), *aff'd*, 500 F.3d 189 (3d Cir. 2007)............................28

*In re Freemarkets, Inc. Sec. Litig.*,
    2000 WL 33914766 (W.D. Pa. Dec. 26, 2000)...................................................................25

*In re Genzyme Corp. Sec. Litig. (Genzyme I)*,
    2012 WL 1076124 (D. Mass. Mar. 30, 2012),
    *aff'd*, 754 F.3d 31 (1st Cir. 2014) ...............................................................................11, 12

*In re Genzyme Corp. Sec. Litig. (Genzyme II)*,
    754 F.3d 31 (1st Cir. 2014)...................................................................10, 11, 12, 26, 29

*In re Hertz Global Holdings, Inc.*,
    905 F.3d 106 (3d Cir. 2018)......................................................................................8

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
    2017 WL 1536223 (D.N.J. Apr. 27, 2017),
    *aff'd*, 905 F.3d 106 (3d Cir. 2018).................................................................................25

*In re Lottery.com, Inc. Sec. Litig.*,
    765 F. Supp. 3d 303 (S.D.N.Y. 2025).............................................................................17

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005)......................................................................................23

*In re MGT Cap. Invs., Inc. Sec Litig.*,
    2018 WL 1224945 (S.D.N.Y. Feb. 27, 2018).....................................................................24

*In re Mylan N.V. Sec. Litig.*,
    2023 WL 3539371 (W.D. Pa. May 18, 2023)............................................................. *passim*

*In re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002).....................................................................................8

*In re Ocugen, Inc. Sec. Litig.*,
    659 F. Supp. 3d 572 (E.D. Pa. 2023),
    *aff'd*, 2024 WL 1209513 (3d Cir. Mar. 21, 2024) ..............................................................8

*In re PayPal Holdings Inc. Sec. Litig.*,
    2025 WL 325603 (D.N.J. Jan. 29, 2025) ..........................................................................21

*In re PolarityTE, Inc. Sec. Litig.*,
    706 F. Supp. 3d 1343 (D. Utah 2020)..............................................................................13

*In re Rite Aid Corp. Sec. Litig.*,
    2025 WL 968306 (E.D. Pa. Mar. 31, 2025).......................................................................26

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016)..............................................................................17

*In re Staffmark, Inc. Sec. Litig.*,
    123 F. Supp. 2d 1160 (E.D. Ark. 2000)............................................................................18

*In re Viatris Inc. Sec. Litig.*,
    2024 WL 4252060 (W.D. Pa. Sept. 20, 2024),
    *aff'd*, 2025 WL 3110790 (3d Cir. Nov. 6, 2025) ....................................................15, 19, 21

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)...............................................................................8, 9, 23, 28

*Lewakowski v. Aquestive Therapeutics, Inc.*,
    2023 WL 2496504 (D.N.J. Mar. 14, 2023)......................................................23, 24, 26, 27

*Martin v. GNC Holdings, Inc.*,
    2017 WL 3974002 (W.D. Pa. Sept. 8, 2017),
    *aff'd*, 757 F. App'x 151 (3d Cir. 2018)..........................................................................2, 17

*Martin v. GNC Holdings, Inc.*,
    757 F. App'x 151 (3d Cir. 2018) ..............................................................................9, 26, 28

*McClain v. Iradimed Corp.*,
    111 F. Supp. 3d 1293 (S.D. Fla. 2015) ...............................................................11, 13, 14

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006).......................................................................................................8

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp. Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) ........................................................................25, 28, 29

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ........................................................................................30

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
    834 F.3d 481 (3d Cir. 2016)...........................................................................................23

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pen. Fund*,
    575 U.S. 175 (2015)......................................................................................................18

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)...........................................................................................21

*Paxton v. Provention Bio, Inc.*,
    2022 WL 3098236 (D.N.J. Aug. 4, 2022) .........................................................14, 20, 28

*Rahman v. Kid Brands, Inc.*,
    2012 WL 762311 (D.N.J. Mar. 8, 2012).........................................................................26

*Rahman v. Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2013)..................................................................................25, 27, 28, 30

*Schaeffer v. Nabriva Therapeutics plc.*,
    2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020)..................................................................29

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019).............................................................................................17

*Tanaskovic v. Realogy Holdings Corp.*,
    2021 WL 211049 (D.N.J. Jan. 21, 2021) ...........................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..................................................................................................2, 8, 9

*Thomas v. Shiloh Indus., Inc.*,
    2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017) .....................................................................29

*Trs. of Welfare and Pen. Funds of Local 464A – Pension Fund v. Medtronic PLC*,
    2025 WL 2784543 (D. Minn. Sept. 30, 2025), *appeal docketed*, No. 25-
    3190 (8th Cir. Nov. 3, 2025)...............................................................................11, 13, 14

*Waswick v. Torrid Holdings, Inc.*,
    2023 WL 9197563 (C.D. Cal. Dec. 1, 2023) .....................................................................17

*Williams v. Globus Medical, Inc.*,
    869 F.3d 235 (3d Cir. 2017)...........................................................................................15, 20

*Wilson v. Bernstock*,
    195 F. Supp. 2d 619 (D.N.J. 2002) ...................................................................................25

*Winer Family Trust v. Queen*,
    503 F.3d 319 (3d Cir. 2007)...............................................................................................20

## STATUTES

15 U.S.C. § 78u-4(b)(2) ......................................................................................................9

15 U.S.C. § 78u-5(i)(1) ..................................................................................................22, 24

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| "¶" or "Complaint" | Amended Class Action Complaint, filed September 30, 2025, ECF No. 53 |
| "Appendix A" | Appendix of the statements challenged by Plaintiffs |
| "ASHP" | American Society of Health-System Pharmacists |
| "Bassin Declaration" | Declaration of Sheryl Shapiro Bassin in Support of Defendants' Motion to Dismiss Amended Class Action Complaint, filed concurrently herewith |
| "cGMP" | Current Good Manufacturing Practices |
| "Class Period" | February 28, 2024 to February 26, 2025 |
| "Company" or "Viatris" | Viatris Inc. |
| "CS" | Challenged Statement (numbered in Appendix A) |
| "Defendants" | Collectively, Viatris Inc., Scott Andrew Smith, Theodora Mistras, and Corinne Le Goff |
| "EIR" | Establishment Inspection Report |
| "Ex." or "Exs." | Exhibit(s) attached to the Bassin Declaration |
| "FDA" or "Agency" | U.S. Food & Drug Administration |
| "Import Alert" | FDA Import Alert No. 66-40 |
| "Individual Defendants" | Collectively, Scott Andrew Smith, Theodora Mistras, and Corinne Le Goff |
| "Indore Form 483" | Form 483 issued to Viatris on June 26, 2024 concerning its Indore, India facility |
| "NAI" | No Action Indicated |
| "OAI" | Official Action Indicated |
| "Plaintiffs" | Steamfitters Local 449 Retirement Security Fund and Susie Hsueh |
| "PSLRA" | Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 (codified at 15 U.S.C. §§ 77z-1 and 78u-4) |
| "VAI" | Voluntary Action Indicated |
| "Warning Letter" | Warning Letter (Reference No. 320-25-28) issued by the FDA to Viatris on December 19, 2024 |

vii

**<u>INTRODUCTION</u>**

Plaintiffs allege securities fraud here that defies logic, common sense, and fails to state a claim. They claim that Defendants had both the prescience to predict future FDA actions and the obligation to disclose them, but instead decided to engage in motiveless and profitless conduct knowing that the public disclosure of the FDA's actions, and the revelation of the so-called fraud, was inevitable within a very short period of time. The Complaint should be dismissed with prejudice.

Plaintiffs claim that Viatris' manufacturing site in Indore, India experienced "persistent and serious cGMP violations both before and during the Class Period," that an undisclosed Form 483 issued by the FDA following an inspection in Indore in June 2024 confirmed these purported "violations," and that, following the inspection, it was inevitable that the FDA ultimately would issue a Warning Letter and impose an Import Alert with respect to the Indore facility and certain products manufactured there, including lenalidomide, because there was no current shortage of that drug in the United States. Plaintiffs are wrong on each count. The Indore facility was in an acceptable state of cGMP compliance before the Class Period, and it is well established that Forms 483 like the one issued in June 2024 do not report "violations" but, rather, "inspectional observations" that may be corrected before any "violation" is found. And although lenalidomide was not in a current shortage when the FDA ultimately issued an Import Alert in December 2024, neither were any of the four other compounds that the FDA carved out from the import restriction.

Plaintiffs cannot meet the "stringent" pleading burdens that apply here for both falsity and scienter. The challenged statements (i) accurately disclosed that Viatris had in the past and may in the future be found to be noncompliant with cGMP, resulting in serious consequences, (ii) accurately stated historical facts, (iii) were vague statements of optimism inactionable as a matter

1

of law, and (iv) were opinions and forward-looking statements that are protected by enhanced pleading requirements.

## FACTUAL BACKGROUND[1]

*__Viatris' Business.__*  Viatris is a global pharmaceutical company that employs approximately 38,000 people worldwide and provides over 4,000 products to roughly one billion patients annually across more than 165 countries.  ¶¶ 2, 30, 150; Ex. 1 at 7.  Viatris' portfolio includes over 1,400 molecules, including branded drugs and generics, across a broad range of therapeutic areas, including cardiovascular health, oncology, ophthalmology, gastrointestinal, and dermatology.  Ex. 1 at 7, 10.  During the Class Period, Viatris operated 26 manufacturing sites on five continents producing oral solids, injectables, complex dosage forms, and APIs.  ¶ 30; Ex. 1 at 11.

*__FDA Inspections for cGMP Compliance.__*  Like all other pharmaceutical companies that supply drugs to the United States, Viatris is subject to various FDA quality control regulations, including cGMP.  ¶ 38.  The FDA inspects drug manufacturing facilities to ensure cGMP compliance and, following such inspections, often issues a Form 483.  ¶¶ 38, 49.  The Form 483 summarizes observations that, in the FDA investigator's opinion, "'*may* constitute violations'" of relevant FDA regulations.  ¶ 51; Ex. 2 at 1.  Each Form 483 states that the observations provided

---

[1] This Factual Background is drawn from (i) the Complaint (cited herein as ¶ __), (ii) documents referenced in the Complaint, and (iii) the Company's SEC filings and other publicly available documents of which the Court may take judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (in ruling on a motion to dismiss, "courts must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124, 128 n.6, 129 n.7 (3d Cir. 2017) (same); *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *1 n.2 (W.D. Pa. Sept. 8, 2017), *aff'd*, 757 F. App'x 151 (3d Cir. 2018).  The Bassin Declaration attaches exhibits that are incorporated by reference in the Complaint (Exs. 1-3, 7, 9-13, 15-18, 20, 21, 25-35) and/or are judicially noticeable (Exs. 4-6, 8, 14, 19, 20-24).  Unless otherwise noted, all emphasis is added and all citations are omitted.  Because securities fraud claims depend on a statement-by-statement analysis, Defendants prepared Appendix A, which provides each of the challenged statements (cited herein as "CS __") and identifies the basis or bases for dismissal.

therein "*are inspectional observations, and do not represent a final Agency determination regarding your compliance*." Ex. 3 at 1.

A Form 483 is the start of the FDA's evaluation of compliance. Ex. 4 at 23 (Form 483 "is the beginning of FDA interactions"). Following the Form 483, the FDA "encourage[s]" companies to "respond . . . in writing with their corrective action plan and then implement that corrective action plan expeditiously." Ex. 2 at 1. The inspector also prepares a draft EIR summarizing the observations, which is circulated internally at the FDA to ultimately arrive at one of three investigatory classifications: No Action Indicated ("NAI"), Voluntary Action Indicated ("VAI"), or Official Action Indicated ("OAI"). VAI and NAI both mean that the FDA considers the site "to be in an <u>acceptable state of compliance with regards to CGMP</u>." Ex. 4 at 27 (emphasis in original). OAI means "regulatory and/or administrative actions are recommended." *See* Ex. 5 at 1. It is only *after* the Form 483, *after* the FDA's preparation and circulation of the EIR,[2] *after* the FDA considers "all evidence or documentation collected on-site," and *after* the FDA considers any responses by the company, including mitigating factors and completed and proposed corrective actions, that the FDA "determines what further action, if any, is appropriate[.]" Ex. 2 at 2.

If the FDA makes the final decision to move forward with a regulatory action, that action can take several different forms: the FDA may issue an "Untitled Letter," for less significant issues (Ex. 7 at § 4-2-1), or a "Warning Letter," for "[s]ignificant violations" that "may lead to enforcement action if not promptly or adequately corrected." *Id.* at § 4-1-1. The FDA also may take additional enforcement steps such as regulatory meetings, seizures or injunctions, recalls, or import restrictions. *See* Ex. 4 at 32.

***Viatris' Risk Disclosures.*** During the Class Period, Viatris provided extensive warnings

---

[2] Although the FDA ultimately provides EIRs to the inspected entities, it does not do so until after the investigation is closed. *See* Ex. 6 at 3.

3

to investors regarding its efforts toward cGMP and regulatory compliance. Viatris disclosed that "***[t]he pharmaceutical industry is heavily regulated, and we face significant costs and uncertainties associated with our efforts to comply with . . . regulations.***" Ex. 1 at 32 (emphasis in original). It explained that "[t]he FDA . . . periodically inspect[s] our manufacturing facilities for compliance with cGMP" and that "***[f]ailure to comply with cGMP . . . could result in an adverse action brought by the FDA[.]***" Ex. 1 at 32-33. Viatris also disclosed that "[a]lthough we have established internal quality and regulatory compliance programs and policies, ***there is no guarantee that these programs and policies, as currently designed, will meet regulatory agency standards in the future or will prevent instances of non-compliance[.]***" *Id.* at 33. It acknowledged that "***despite our compliance efforts, we . . . have in the past and may in the future receive notices of manufacturing and quality-related observations following inspections***," *i.e.*, Form 483s, "as well as official agency correspondence regarding compliance," *i.e.*, Warning Letters. *Id.* It also disclosed the consequences that had resulted, and could result, from findings of cGMP noncompliance, stating that "***[f]ailure to comply with cGMP and other regulatory standards . . . has resulted and could in the future result in***" among other things, "***warning letters***", "***unanticipated compliance expenditures***", and "***refusal[s] to permit import [of products.]***" *Id.*

*Viatris' Indore Site.* Viatris' facility in Indore, India is one of its 26 manufacturing sites worldwide. ¶¶ 30, 32, 159. Although Viatris generally did not publicly disclose which specific facility (or facilities) manufacture particular products (¶ 37), the Indore site is focused on the manufacture of oral solid drugs. ¶ 159. Like all Viatris sites, Indore was subject to FDA inspections. In the two FDA inspections preceding the Class Period, in May 2019 and October 2019, the FDA found the Indore facility to be in an acceptable state of cGMP compliance. Ex. 4

4

at 27; Ex. 8; ¶ 54.  In June 2024, the FDA inspected the Indore facility again and issued a Form 483 that cited six inspectional observations.  ¶ 57.  In response, Viatris "immediately implemented a comprehensive remediation plan at the site" which included terminating certain employees and engaging "independent third-party subject matter experts to support the remediation plan."  *See* Ex. 9 at 1; ¶ 206.  And, as is typical, Viatris engaged actively with the FDA regarding its efforts to remediate the observations.  ¶ 207.

On December 19, 2024, approximately six months after the inspection, the FDA issued a Warning Letter to the Company, citing two of the six inspectional observations from the Form 483 for which the FDA found the Company's responses inadequate.  Ex. 10 at 2-3.  The first observation related to the FDA's finding that biometric access records showed that certain analysts were not physically present during testing.  ¶ 72.  The FDA acknowledged that Viatris had suspended certain testing in the implicated facility, initiated additional sample testing, and terminated the on-site team responsible for violations of policies.  However, the FDA found Viatris' response "fail[ed] to provide sufficient details regarding the extent of the identified data integrity issues and the thoroughness of [Viatris'] proposed corrective and preventative actions" to be "unclear."  ¶ 74.

The Warning Letter's second observation pointed to an instance in which an analyst aborted a testing sequence "without providing adequate justification" and "lacked evidence to substantiate the root cause" of the improper results.  ¶ 69.  The FDA also noted that the site invalidated assay and content uniformity results, attributing the issue to a problem with testing equipment that was not substantiated by the equipment's audit trail.  ¶ 69.  The FDA noted that Viatris had committed to "perform an extended evaluation across the rest of the laboratory to evaluate . . . laboratory practices and controls," but directed Viatris to undertake various additional

remedial steps. ¶ 70. As noted in the Warning Letter, the FDA simultaneously took the additional step of placing the Indore site on an Import Alert. ¶ 67; Ex. 10 at 6. The Warning Letter directed Viatris to provide a response in 15 days and requested that the Company "immediately" contact the FDA if Viatris believed any of the remaining products on the Import Alert were "likely to lead to a disruption in the supply of drugs produced at [Indore]" so the FDA could "consider, as soon as possible, what actions, if any, may be needed to avoid shortages and protect the health of patients[.]" Ex. 10 at 6.

Viatris disclosed that it had received the Warning Letter and Import Alert on December 23, 2024, and both documents were available to the public on the FDA website around that same date. Viatris explained that 11 oral solid drug products were produced at Indore that would not be accepted into the United States until the Import Alert was lifted. Ex. 9 at 1. Viatris also noted that the FDA made exceptions for "four products based on shortage concerns" and that there "could be the potential for additional exceptions based on further discussions with the Agency." ¶ 157; Ex. 9 at 1. The Company explained that "we do not anticipate [the Warning Letter and Import Alert to] impact[] our current 2024 financial guidance" and that it would "incorporate potential future impact in our 2025 guidance ranges when we provide [them] in early 2025." *Id.*

Following the Import Alert, Viatris promptly engaged the FDA in seeking additional exceptions, including for lenalidomide, which was manufactured in Indore. Lenalidomide is the generic version of Revlimid, a patent-protected treatment for multiple myeloma manufactured by Celgene. ¶¶ 3, 32, 96. Certain generic manufacturers, including Viatris, are permitted to sell volume-restricted amounts of lenalidomide under a settlement with Celgene. ¶¶ 96, 97. However, because generic lenalidomide can only be sold in limited quantities, there was a potential for disruptions in patient access. *See, e.g.*, Ex. 11 at 8-9.

6

On January 14, 2025, Viatris reported to investors it was still in "active discussions with the FDA to add more products to that exempt list" and that, due to the uncertainty of ongoing discussions, the Company would not disclose the specific products impacted by the Import Alert at that time.  ¶ 159.  In parallel, the Company worked to explore the possibility of procuring alternative sources of the drugs impacted by the Import Alert, including lenalidomide.  *See* ¶ 176. However, in the ensuing weeks it became clear that those efforts were unlikely to be immediately successful.

On February 27, 2025, Viatris issued a press release reporting fourth quarter and 2024 financial results and disclosed the estimated financial impact of the Import Alert.  As predicted, the Import Alert did not impact 2024 financial results, and the Company met or exceeded guidance. Ex. 12 at 1.  However, Viatris explained that "[f]ollowing recently concluded interactions with the FDA" the Company "currently d[id] not expect any additional product exceptions to be granted." *Id.* at 5.  Therefore, Viatris disclosed that lenalidomide and another cancer drug produced in Indore were expected to be impacted.  *Id.*  The Company projected that in 2025 it would achieve $13.5 to $14 billion in revenue and $3.9 to $4.2 billion in adjusted EBITDA, and the estimated impact of the Import Alert was approximately $500 million in revenue (~3.5%) and $385 million in adjusted EBITDA (~9.1%).  Ex. 12 at 5, 7.  Lenalidomide was estimated to account for about 40 and 50 percent of those amounts, respectively, *i.e.*, a projected impact of no more than ~1.75% in revenue and ~4.55% in EBITDA.  Ex. 13 at 5, 9.

***This Lawsuit.***  This action was filed on April 4, 2025.  ECF No. 1.  After they were appointed as lead plaintiffs on August 1, 2025, Plaintiffs filed the amended Complaint on September 30, 2025.  The Complaint alleges two counts: a violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder against all Defendants and a violation

of Section 20(a) against the Individual Defendants.  ¶¶ 238-253.  The Complaint names three Individual Defendants: Scott A. Smith, who has served as Viatris' CEO since April 2023 (¶ 23), Theodora Mistras, who has served as CFO since March 1, 2024 (¶ 24), and Corinne Le Goff, who has served as Chief Commercial Officer since April 15, 2024. ¶ 25.

## ARGUMENT

### I.     THE APPLICABLE PLEADING STANDARDS GOVERNING THIS CASE

To allege a Section 10(b) securities fraud claim, a plaintiff must plead, among other things, "'a material misrepresentation or omission'" and "scienter." *In re Hertz Global Holdings, Inc.*, 905 F.3d 106, 114 (3d Cir. 2018).  Importantly, Plaintiffs' claim is subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252-53 (3d Cir. 2009).  Rule 9(b), which is "rigorously applied in securities fraud cases," requires that plaintiffs specify the "'who, what, when, where, and how: the first paragraph of any newspaper story.'" *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004).

Through the PSLRA, Congress imposed "[e]xacting" and "heightened pleading requirements" on plaintiffs seeking to bring securities fraud class actions.  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81-82 (2006); *Tellabs*, 551 U.S. at 313.  The PSLRA requires Plaintiffs to identify with particularity the allegedly false and misleading statements "***and*** specify with particularity the 'true facts' that demonstrate how each statement or omission was indeed false or misleading[.]" *In re Ocugen, Inc. Sec. Litig.*, 659 F. Supp. 3d 572, 588 (E.D. Pa. 2023), *aff'd*, 2024 WL 1209513 (3d Cir. Mar. 21, 2024).  "To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).

"'Scienter is a mental state embracing intent to deceive, manipulate, or defraud, [that]

requires a knowing or reckless state of mind.'" *In re Columbia Labs., Inc. Sec. Litig.*, 2013 WL 10914123, at \*3 (D.N.J. June 11, 2013). This standard "is high: 'a reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, [that] presents a danger of misleading buyers . . . that is either known . . . or is so obvious that the [defendant] must have been aware of it.'" *Id.*; *see also, e.g.*, *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 153-54 (3d Cir. 2018) (same). The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see also Avaya*, 564 F.3d at 253. To qualify as a "strong inference," the particularized facts must be "cogent" and "compelling" when considering nonculpable explanations for the defendants' conduct. *Tellabs*, 551 U.S. at 323-24.

## II.    PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE STATEMENT

Plaintiffs' Complaint involves two time periods that advance distinct theories of fraud. In the first period, which runs from the beginning of the Class Period until Viatris' disclosure of the Warning Letter and Import Alert on December 23, 2024 (*i.e.*, approximately ten months), Plaintiffs claim that Viatris failed to disclose "persistent and serious cGMP violations" at Indore that created a "high likelihood" that the FDA's June 2024 inspection and Form 483 would result in the FDA imposing the Import Alert that impacted lenalidomide. *See, e.g.*, ¶¶ 7, 131(c), 151. In the second period, which runs from the disclosure of the Warning Letter and Import Alert on December 23, 2024 to the end of the Class Period on February 26, 2025 (*i.e.*, approximately two months), Plaintiffs allege that Viatris committed fraud by failing to disclose that lenalidomide was manufactured at Indore and that there was purportedly "no realistic prospect" that lenalidomide could qualify for an exception under the Import Alert. *See, e.g.*, ¶¶ 158(c), 160(a), 162. As explained below, Plaintiffs fail to state a claim as to any challenged statement in either of these

9

periods.[3]

### A.     Viatris' Pre-Warning Letter Statements Are Not Actionable

#### 1.     Viatris Was Not In "Violation" of cGMP Before the Warning Letter

For the first time period in the Complaint, the crux of Plaintiffs' claims are "persistent and serious cGMP violations" at the Indore facility that rendered various statements misleading. *See, e.g.*, ¶¶ 7, 131(c), 151. As explained herein, Plaintiffs do not plead any actionable statement during this period. But this theory of fraud also fails *ab initio* because Plaintiffs repeatedly and inaccurately conflate receipt of Forms 483 with the finding of a cGMP "violation."[4]

To the contrary, as numerous authorities recognize, Form 483s do not reflect "violations." Instead, "the 'advisory language that accompanies all Forms 483' makes clear that the forms '***do not represent the FDA's final word[.]***" *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *14 (W.D. Pa. May 18, 2023); Ex. 3 at 1 (providing advisory language); *see also, e.g.*, *In re Checkpoint Therapeutics Sec. Litig.*, 2025 WL 1434400, at *23 n.11 (S.D.N.Y. May 19, 2025) (collecting authorities; "[c]ourts have widely recognized that a Form 483 represents 'interim FDA feedback.'"); *In re Genzyme Corp. Sec. Litig. (Genzyme II)*, 754 F.3d 31, 42 (1st Cir. 2014) (Forms 483 "are merely observational in nature"). In fact, the FDA itself instructs that observations in Forms 483 cannot be characterized as "violative" as "[t]he determination of whether any condition is 'violative' is an agency decision made after considering all circumstances, facts and evidence." Ex. 14 at § 5.5.11.

---

[3] Plaintiffs' Complaint includes a third time period, spanning from the Form 483 through the Warning Letter and Import Alert. ¶¶ 140-155. Plaintiffs' only distinct allegation in this period is that the statements "were particularly misleading in light of Viatris'[] undisclosed receipt of the [Form 483]." *See, e.g.*, ¶¶ 144, 149. As discussed below, there was no duty for Viatris to disclose the receipt of the Form 483, so there is no need to view this as a separate period.

[4] This inaccuracy appears nearly 20 times throughout the Complaint. ¶¶ 8, 49, 51, 52, 54, 55, 57, 59, 61, 62, 126(c), 129, 137(c), 144(d), 146(a), 146(d), 149(d), 206, 207.

Thus, Viatris was not found to be in "violation" of anything upon receipt of a Form 483. Instead, it "had the opportunity to address [the Form's] feedback, while continuing its operations" (*Mylan*, 2023 WL 3539371, at *14), and it had no duty to disclose the Form 483 while it did so. *Trs. of Welfare and Pen. Funds of Local 464A – Pension Fund v. Medtronic PLC*, 2025 WL 2784543, at *20 (D. Minn. Sept. 30, 2025) ("In general, a company has no obligation to inform the public about the receipt of a Form 483."), *appeal docketed*, No. 25-3190 (8th Cir. Nov. 3, 2025).[5]  Instead, as numerous decisions confirm, Viatris appropriately waited until the FDA took official action to make any disclosure.  *Genzyme II*, 754 F.3d at 41-42 (no duty to disclose a Form 483 "at the time it was issued by the FDA" when it was disclosed with a warning letter).[6]

Plaintiffs suggest the Warning Letter and Import Alert were an inevitable outcome of the June 2024 Form 483.  *See, e.g.*, ¶ 85.  But Plaintiffs do not offer any particularized facts to show that anyone at Viatris could have, or should have, known in advance that the FDA would issue the Warning Letter and Import Alert.  Instead, Plaintiffs premise their theory on the opinions of a purported FDA expert, Mr. Todd Clark, and on their claim that the Indore site had a purportedly "poor" history of regulatory compliance before the Class Period.  ¶¶ 55, 84-85.  As a threshold matter, "PSLRA complaints must allege specific *facts* demonstrating material misstatements or

---

[5] *See also, e.g.*, *Checkpoint*, 2025 WL 1434400, at *17 (no "freestanding legal duty to disclose" receipt of Form 483); *In re Genzyme Corp. Sec. Litig. (Genzyme I)*, 2012 WL 1076124, at *10 (D. Mass. Mar. 30, 2012) (requiring disclosure of a Form 483 "would be to insist on a flood of data that would overwhelm the market and would ironically be, in the end, actually uninformative."), *aff'd*, 754 F.3d 31 (1st Cir. 2014); *City of Pontiac Gen. Emps. Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 825 (W.D. Mich. 2012) (no duty to disclose Form 483 because it "was not the final word on . . . compliance with FDA regulations").

[6] *See also, e.g.*, *Fire & Police Pen. Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 243-44 & n.9 (1st Cir. 2015) (disclosure of a Form 483 was not required; investors were not misled since "the company did not withhold information about the FDA's concerns once the FDA issued a Warning Letter"); *McClain v. Iradimed Corp.*, 111 F. Supp. 3d 1293, 1305 (S.D. Fla. 2015) (a company is not required to "prematurely disclose" a Form 483 before the issuance of a warning letter because the Form 483 "does not represent a final Agency determination").

omissions made with scienter" and "[expert] *opinions* cannot substitute for facts under the PSLRA." *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006); *see also, e.g.*, *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 354 (2d Cir. 2022) (similar); *In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 510 n.25 (E.D. Pa. Aug. 2, 2018) (considering and rejecting expert opinions at the pleading stage, noting "[t]he Court would likely be correct in choosing to entirely ignore Plaintiffs' expert's opinions."), *aff'd sub nom. Spizzirri v. Zyla Life Scis.*, 802 F. App'x 738, 739 (3d Cir. 2020). Thus, Mr. Clark's opinions can and should be disregarded in full.

But even if his opinions are considered, they do not change the result. Mr. Clark opines that "the fact that [the Form 483] was addressed to a senior executive" is indicative that "an OAI classification and enforcement action were likely to follow the inspection at Indore." ¶ 85; *see also* ¶ 57 (similar).[7] If anything, this demonstrates Clark's lack of expertise: as Plaintiffs admit, any Form 483 is to be directed to "firm management" (¶ 51) and "it is common protocol for the FDA to present Forms 483 to top management officials." *Genzyme II*, 754 F.3d at 35. Similarly, Clark's views regarding the length of the June 2024 Form 483 (¶ 85) are irrelevant. The document contained only six observations in total. Numerous courts have acknowledged that Forms 483 with many more observations do not necessarily portend FDA enforcement. *See, e.g.*, *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 50-53 (2d Cir. 1995) (multiple FDA inspection reports, including one spanning 20 pages, with more than 130 total observations); *Genzyme I*, 2012 WL 1076124, at *3 (Form 483 containing "at least sixteen" observations).

---

[7] Notably, Mr. Clark does not opine on what type of enforcement action the FDA would take and, thus, apparently does not concur with Plaintiffs' claim that there was a "high likelihood" that the inspection would result in an Import Alert. Plaintiffs' purely conclusory and hindsight-based allegation in that regard should therefore be disregarded. *In re Discovery Labs. Sec. Litig.*, 2007 WL 789432, at *5 (E.D. Pa. Mar. 15, 2007), *aff'd*, 276 F. App'x 154 (3d Cir. 2008).

Nor does Mr. Clark's opinion regarding the purported seriousness of the Form 483's observations move the needle. ¶ 85. The law recognizes that "even a damning Form 483 may be remedied in time to avoid any disruption[.]" *Medtronic*, 2025 WL 2784543, at *19; *accord Mylan*, 2023 WL 3539371, at *13 ("systemic quality and data integrity issues would not mean that 'it was impossible' . . . to execute [a] business strategy"). And courts regularly find that exceedingly serious Form 483 observations need not be disclosed upon receipt because it is still possible to correct them. *See, e.g.*, *Medtronic*, 2025 WL 2784543, at *4 (no duty to disclose Form 483 reflecting "'multiple, systemic deficiencies' that 'went well beyond . . . already significant manufacturing defects'" including "inappropriate risk analysis" and "fail[ure] to investigate '[c]omplaints involving the possible failure of a device to meet any of its specifications'").[8]

Plaintiffs' allegation that Viatris' Indore site had a "history" of "poor" FDA compliance prior to the Class Period fares no better—and it is notable that Mr. Clark does not offer an opinion to support it. This is for good reason. In May 2019, the site was inspected and received an NAI (No Action Indicated) classification. Ex. 8. And although the FDA did issue a Form 483 following the October 2019 inspection, that inspection resulted in a VAI (Voluntary Action Indicated) classification. ¶ 54. Thus, far from a "history" of "poor" compliance, FDA found the site "to be in an <u>acceptable state of compliance with regards to CGMP</u>" following both inspections. Ex. 4 at 27 (emphasis in original); *see also In re PolarityTE, Inc. Sec. Litig.*, 706 F. Supp. 3d 1343, 1359 (D. Utah 2020) (VAI classification does "'not meet the threshold of regulatory significance'").

Finally, Plaintiffs' allegation that Defendants became aware of "serious data-integrity violations at the Indore facility [by] no later than January 2024" (¶¶ 9, 75) is based on a single

---

[8] *See also, e.g.*, *Iradimed Corp.*, 111 F. Supp. 3d at 1298 (insufficient records and inadequate investigations); *Discovery Labs.*, 2007 WL 789432, at *4 (observations of "failure properly to control conditions", "failure to investigate", and "failure to keep proper documentation" although "expensive or time-consuming" were "eminently correctable").

13

sentence in the Warning Letter: "[i]n subsequent communications following the [June 2024] inspection, you disclosed that both your site and global quality organization became aware of the data integrity issues related to component testing in January 2024."  ¶ 75; Ex. 10 at 2.  This allegation fails to even identify what these purported "data integrity issues" were, whether they were deemed significant, who at the site and in the global quality organization purportedly "became aware" of them, or whether they were shared with the Individual Defendants.  *See, e.g.*, *Paxton v. Provention Bio, Inc*., 2022 WL 3098236, at *14 (D.N.J. Aug. 4, 2022) (dismissing complaint that failed to plead "when the Company learned of these deficiencies [or] the extent or severity of these deficiencies").  Moreover, even if credited, the allegation that unidentified individuals within Viatris were aware of certain undescribed "issues" before the June 2024 Form 483 does not render any of Viatris' challenged statements misleading.  Courts recognize that companies that were irrefutably aware of issues far more serious than those in the Indore Form 483, such as widespread and life-threatening product defects that required product recalls, were not required to prematurely disclose purported "violations" in advance of a formal FDA finding of non-compliance.  *See, e.g.*, *Medtronic*, 2025 WL 2784543, at *4-5; *Iradimed Corp.*, 111 F. Supp. 3d at 1304-05 (similar).

    **2.**     **None of the Challenged Pre-Warning Letter Statements Is Actionable**

   ***Viatris' Risk Disclosures.*** Turning to the challenged statements, Plaintiffs first challenge Viatris' extensive disclosures about the risks Viatris faced regarding regulatory compliance.[9]  CS

---

[9] These challenged statements are first found in Viatris' 2023 Form 10-K filed on February 28, 2024 (CS 1, 3-6) and were also incorporated by reference into numerous additional earnings releases and quarterly and annual reports.  ¶¶ 135-136 (CS 5, 6); *see also* ¶ 138 (CS 7, 8) (challenging the same statements in the April 26, 2024 Form 10-K/A and Forms 8-K and 10-Q filed on May 9, 2024); ¶ 141 (CS 10) (July 3, 2024 Form 8-K); ¶¶ 142-143 (CS 11-13) (August 8, 2024 Form 10-Q); ¶ 148 (CS 16-17) (November 7, 2024 Form 10-Q).  Plaintiffs also challenge factual statements in the Form 10-K that, in 2023, "an important growth driver" included the "recent launch[] of lenalidomide" and that new sales from lenalidomide "helped to partially offset

7, 8, 10, 11, 13, 15, 17.  Plaintiffs claim that these disclosures "misleadingly described" regulatory risks "as being 'in the past' or merely hypothetical . . . despite their awareness of Viatris'[] cGMP violations at the Indore facility and vulnerability to an import ban[.]"  ¶¶ 135-137, 144, 147, 148, 149.  Plaintiffs also claim that the disclosures after the June 2024 inspection were misleading due to Viatris' "ongoing, undisclosed remediation efforts[.]"  ¶ 146(f); *see also* ¶¶ 144(d), 149(c).

As an initial matter, Plaintiffs cannot claim that Viatris was "aware" of cGMP "violations" at Indore until the issuance of the Warning Letter in December 2024 because the FDA had not found Viatris in "violation" of anything until that point.  Section II(A)(1), *supra*; *Williams v. Globus Medical, Inc.*, 869 F.3d 235, 244-45 (3d Cir. 2017) (rejecting allegations relying on "conjecture based on subsequent events").  And Plaintiffs' claim that Viatris' risk disclosures were "hypothetical" is wrong: Viatris stated that it "***ha[d] in the past*** and ***may in the future*** receive notices of . . . quality-related observations following inspections [*i.e.*, Form 483s] as well as official agency correspondence compliance [*i.e.*, Warning Letters]" and that those regulatory observations and correspondence had, among other things, resulted in "unanticipated compliance expenditures," *i.e.*, remediation.  Ex. 1 at 33.  The disclosures also did not omit that Viatris was vulnerable to an import ban; to the contrary, they specifically disclosed that "[f]ailure to comply with cGMP . . . could in the future result in the . . . refusal to permit import [of products.]"  *Id.*  Thus, both before and after receipt of the June 2024 Form 483, the Company's risk disclosures accurately warned investors not only that it was a risk that Viatris ***might*** receive Forms 483 and Warning Letters in the future, but that it ***had previously received*** such correspondence, requiring unexpected

---

. . . anticipated lower net sales" of existing products.  ¶ 130 (CS 3).  But Plaintiff does not claim lenalidomide was not a "growth driver" following its launch or it did not partially offset sales from existing products.  Thus, they were accurate statements of historical fact and are inactionable as a matter of law.  *In re Viatris Inc. Sec. Litig.*, 2024 WL 4252060, at *13 (W.D. Pa. Sept. 20, 2024) (citing authorities), *aff'd*, 2025 WL 3110790 (3d Cir. Nov. 6, 2025); *see* Section II(B), *infra*.

15

remediation efforts and expenditures, and that one potential consequence could be an Import Alert.

In fact, Judge Ranjan rejected the same argument Plaintiffs attempt here, finding that substantially identical risk disclosures told "investors that [Viatris], in fact, had already received (and would continue to receive) notices of non-compliance" and "advised investors of the potentially severe consequences of any non-compliance." *Mylan*, 2023 WL 3539371, at *11-12. As a result, the disclosures did not "misleadingly 'suggest that adverse consequences were only a possibility' and that the company was currently compliant despite allegedly 'widespread' and 'serious compliance issues.'" *Id.* at *12. Rather, "they told investors the truth: [Viatris] faced serious business risk because of the heavily regulated industry in which it operated, and that maintaining adequate compliance would be a significant undertaking—an undertaking at which it would sometimes come up short." *Id.* Judge Ranjan's reasoning applies equally here.

**_Vague Statements of Optimism._** Most, if not all, of the remaining pre-Warning Letter statements that Plaintiffs challenge (CS 1, 2, 4, 5, 9, 12, 14, 16, 18) are "'vague and general statement[s] of optimism'" that are not actionable as a matter of law. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 172 (3d Cir. 2014). Again, as Judge Ranjan held in rejecting claims involving many virtually identical statements,[10] the Company's statements such as those regarding its "strong commitment to quality," "best-in-class manufacturing" (¶¶ 133, 139, 143, 148, CS 4, 9, 12, 16), "robust quality infrastructure and strategy" (¶ 127, CS 2) are nothing more than "loosely optimistic" statements that were "'so vague, broad, and non-specific'" and that a reasonable investor would not rely on them. *Mylan*, 2023 WL 3539371, at *10-11. So, too, are Viatris'

---

[10] Specifically, the court rejected claims based on statements regarding a "deep and unwavering commitment to quality" (*compare Mylan*, 2023 WL 3539371, at *10, *with* ¶¶ 127, 133, 139, 143, 145, 148, CS 2, 4, 9, 12, 14, 16), and "stringent" quality protocols (*compare id.*, *with* ¶ 127, CS 2) that utilized "advanced" and "state-of-the-art" monitoring systems that "meet or exceed industry standards" (*compare id.*, *with* ¶¶ 127, 133, CS 2, 4).

16

statements that it applied "exacting conditions" and "strict" controls in manufacturing (¶ 125, CS 1), that it used "industry best practices" (¶ 127, CS 2), and that it had a "commitment to good manufacturing practices" (¶ 145, CS 14) and was "committed to conducting [its] business . . . in compliance with all applicable laws and regulations." ¶ 135, CS 5. *See, e.g.*, *Singh v. Cigna Corp.*, 918 F.3d 57, 61, 63 (2d Cir. 2019) (statement regarding handling information "'in compliance with all laws and regulations'" was a "textbook example" of puffery); *GNC*, 2017 WL 3974002, at *8 (GNC's claim to be an "industry leader" that "sets [industry standards]" puffery).[11]

**_Opinion Statements._**  Plaintiffs also challenge opinion statements by CEO Smith and CFO Mistras at an investor conference on November 21, 2024.  ¶¶ 150-153 (CS 18, 19).  Plaintiffs challenge Smith's concurrence with an analyst's statement that Viatris was "very diverse from a product and geographic perspective."  ¶ 150.  Smith responded that the statement was "a good characterization" and explained that the Company's portfolio of "4,400 different products" in "165 countries" provided an "incredible base of stability" because "not one product in any one geography really changes the needle."  *Id.* (CS 18).  Later, Smith said, "I think the company is significantly undervalued at where we sit today" and that "what's underappreciated is the stability of the base business[.]"  ¶ 152 (CS 19).  Plaintiffs also challenge CFO Mistras' response to an analyst's question on whether pricing stability in 2024 was a "reasonable baseline . . . to start to think about 2025," explaining that the "stability that we've . . . seen in the base business" was a

---

[11] *See also, e.g.*, *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1321 (11th Cir. 2019) (statements that a company was "taking a 'leading role' . . . toward compliance" were puffery); *In re Exscientia PLC Sec. Litig.*, 2025 WL 2886489, at *12 (D.N.J. Oct. 10, 2025) (statements about "'highest standards of business conduct'" were puffery; "[s]triving to comply is not an assurance of actual compliance"); *In re Lottery.com, Inc. Sec. Litig.*, 765 F. Supp. 3d 303, 340 (S.D.N.Y. 2025) (statement of "'firm[] commit[ment] to full compliance with all applicable laws'" dismissed as "too general to induce reasonable reliance"); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 401 (S.D.N.Y. 2016) (statements regarding an "effective compliance organization" that was "aligned with the industry's best practices" not actionable); *Waswick v. Torrid Holdings, Inc.*, 2023 WL 9197563, at *6 (C.D. Cal. Dec. 1, 2023) ("'state-of-the-art' is in the eye of the beholder.").

"factor[]" that provided "momentum we expect to see in the next year." ¶ 152 (CS 19).

Plaintiffs do not come close to meeting their pleading burden to challenge these statements for several reasons. First, what constitutes "stability" generally (¶ 152) or an "incredible base of stability" (¶ 150) is inherently subjective, and no reasonable investor would rely on such remarks. *See, e.g.*, *Cambridge Ret. Sys. v. MEDNAX, Inc.*, 2019 WL 4893029, at *13, *17 (S.D. Fla. Oct. 3, 2019) (statement that company was "a very stable business" was "corporate optimism" reflecting "subjective beliefs"); *Tanaskovic v. Realogy Holdings Corp.*, 2021 WL 211049, at *20-21 (D.N.J. Jan. 21, 2021) (similar). Similarly, a remark that a company is "undervalued" is "precisely" the type of "'rosy' affirmation . . . that amounts to no more than immaterial puffery." *Finocchiaro v. NQ Mobile, Inc.*, 2018 WL 1217728, at *5 (S.D.N.Y. Feb. 27, 2018); *In re Staffmark, Inc. Sec. Litig.*, 123 F. Supp. 2d 1160, 1173 (E.D. Ark. 2000) (similar).

In addition, each of these statements expressed the speaker's opinion. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pen. Fund*, 575 U.S. 175, 183-84 (2015) (words like "I think" or "I believe" connote opinions). To plead the falsity of an opinion statement, Plaintiffs must allege particularized facts to show that the challenged statements (i) were not sincerely believed when made, (ii) contained "untrue factual assertion[s]," or (iii) "reasonably implie[d] untrue facts." *City of Warren Police and Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023). This "'is no small task' because 'a reasonable investor understands that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion.'" *Mylan*, 2023 WL 3539371, at *12. Here, Plaintiffs do not suggest these opinions were not sincere, nor do Plaintiffs allege that Viatris did not have 4,400 products or did not operate in 165 countries.

Instead, Plaintiffs argue that the statements "reassured investors that Viatris'[] financial

18

growth would continue through 2025" (¶ 154) while omitting that "Defendants knew that the severe cGMP problems at Indore were highly likely to deprive Viatris in 2025 of substantial revenue and profits it had earned from lenalidomide in 2024." ¶ 153. But the statements themselves spoke only to the breadth of Viatris' expansive portfolio—they did not speak to regulatory compliance in general or lenalidomide in particular. *Mylan*, 2023 WL 3539371, at *13 (rejecting claim that opinion statement regarding the "suitability" of facilities implied regulatory compliance because the statement "[did] not go to whether those facilities complied with all regulatory requirements"). Plaintiffs also offer no particularized facts to suggest Defendants knew the FDA would issue a Warning Letter or Import Alert at the time these statements were made— a development that occurred over a month later. *See, e.g.*, *id.* at *13 (Forms 483 did not render "optimistic opinion[s] about [the] future" misleading).

Finally, to the extent that Plaintiffs attack Mistras' forward-looking opinion about the "factors" that provided "momentum" into 2025 (CS 19), Judge Horan recently dismissed nearly identical claims, finding statements such as "[w]e believe that the diversity of our portfolio . . . positions us well to balance the impact of any changes in the market" and "our pipeline will be recognized as one of the company's most underappreciated assets" were "opinions regarding the future" and "squarely within the realm of nonactionable language because they express future expectations and not present facts." *Viatris*, 2024 WL 4252060, at *11. The same result applies here.[12]

### B.    Viatris' Post-Warning Letter Statements Are Not Actionable

Plaintiffs claim the challenged statements following the December 23, 2024 announcement

---

[12] In addition, to the extent that the opinions expressed a view about the future, they are forward looking statements protected by the PSLRA's Safe Harbor for forward looking statements for the same reasons as explained below in Section II(B), *infra*.

of the Warning Letter and Import Alert (CS 20-23) were misleading because Viatris failed to disclose that "lenalidomide was manufactured at the Indore facility" and "that there was no realistic prospect that lenalidomide . . . would qualify for an 'additional exception[.]'" *See, e.g.*, ¶¶ 158(a), (c), 160(a), (b); ¶¶ 162-63, 167 (similar). These claims fail because Viatris was under no obligation to disclose lenalidomide would be impacted by the Import Alert sooner than it did.

The securities laws do not require public disclosure of information simply because the information might be of interest to investors. *Winer Family Trust v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007) (no duty to disclose information simply because it "'would be interesting, market-wise'"). Thus, "'[e]ven non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information.'" *Williams*, 869 F.3d at 241; *see also Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) ("firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose."). Where, as here, there is no allegation of insider trading or a statute requiring disclosure, an affirmative duty to disclose arises only when a statement is rendered false or misleading by omission. *Winer*, 503 F.3d at 329-30.

It is important to note that, in general, Viatris did not disclose which drugs it manufactured at particular facilities (¶ 37) and did not report the earnings attributable to lenalidomide. *See* ¶ 36. And Viatris was not required to immediately deviate from that practice just because the FDA issued the Warning Letter and Import Alert. To the contrary, "[i]t is . . . well settled that '[d]efendants are permitted a reasonable amount of time to evaluate potentially negative information and to consider appropriate responses before a duty to disclose arises.'" *City of Brockton Ret. Sys. v. Avon Prod., Inc.*, 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014); *see also, e.g.*, *Prevention Bio*, 2022 WL 3098236, at *13 (similar; collecting authorities). That is

20

exactly what Viatris did: it promptly disclosed the Warning Letter and Import Alert and told investors that it was in the process of evaluating the potential impact to 2025, which it then provided when it announced its 2025 financial guidance. *See* ¶ 159; Ex. 9. Against this backdrop, Plaintiffs do not plead any statement was rendered false or misleading by omission.

***Factual Statements.*** Plaintiffs first claim that factual statements describing the Indore facility as "an important facility within our global network" that was "1 of 26 manufacturing facilities" focused on "oral solid doses" (¶ 159, CS 21) were misleading because they "downplay[ed] the significance and financial impact of the Indore inspection results" and "omitt[ed] that lenalidomide was produced at Indore and was subject to the import bar[.]" ¶ 160(a). But Plaintiffs do not claim that any of these factual statements, which accurately describe the Indore site, were false. *See, e.g.*, *Oran v. Stafford*, 226 F.3d 275, 284-85 (3d Cir. 2000) (rejecting the claim that a "simple (and accurate) factual assertion" required disclosure of "any material facts that would have tended to contradict . . . positive representations"); *In re Amarin Corp. PLC Sec. Litig.*, 2015 WL 3954190, at *6 (D.N.J. June 29, 2015) (similar). Similarly, Plaintiffs' challenge to Chief Commercial Officer Le Goff's statement that lenalidomide had "been . . . a stable component of our generic portfolio" (¶ 159, CS 21) fails. Plaintiffs do not claim that lenalidomide was not historically a "stable component" of Viatris' portfolio, and "accurate statements of historical results are not actionable." *Viatris*, 2024 WL 4252060, at *13 (citing authorities); *In re PayPal Holdings Inc. Sec. Litig.*, 2025 WL 325603, at *13 (D.N.J. Jan. 29, 2025).

Plaintiffs also allege that Defendants are responsible for statements that were found in a January 17, 2025 Barclays report and a February 7, 2025 UBS report. *See, e.g.*, ¶¶ 161, 163, 165, 167 (CS 22-24). But neither report purports to quote any Defendant, nor are any allegedly misleading statements in the reports attributed to any Defendant. Exs. 15, 16. "Defendants cannot

21

be held responsible for statements they did not make." *Pfizer*, 754 F.3d at 172. Moreover, Barclays merely stated that the drugs impacted by the Import Alert were "all oral solids, with no complex products" and that discussions with the FDA had "been slow" due to the "holiday season." ¶ 161. Plaintiffs cannot challenge the accuracy of the "oral solids" statement, nor do they plead any fact to suggest that the holiday season did not impact the Company's dialogue with the FDA. And to the extent Plaintiffs claim the UBS report shows that Viatris "selectively identified" levothyroxine as a product with an exception (¶¶ 11, 167, 177), Viatris did not "selectively" disclose anything: the public Import Alert disclosed all the exceptions, including levothyroxine. Ex. 17 at 137-38.[13]

***Forward-Looking Statements.*** Plaintiffs also challenge CEO Smith's statements that the Import Alert was anticipated to be "a little bit [of] a headwind" that Viatris "[took] . . . very seriously" as it "move[d] into 2025" (¶ 159, CS 21) and CFO Mistras' statement confirming that the Import Alert was a "headwind" to "consider as we think about 2025." *Id.* (CS 21). These statements are protected under the PSLRA's Safe Harbor for forward-looking statements, which, among other things, immunizes "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer" and statements of "future economic performance." 15 U.S.C. § 78u-5(i)(1)(B-C).

Specifically, the Safe Harbor protects forward-looking statements in two ways: (1) if they are "'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement'"; or (2) if the

---

[13] Based on the UBS report's passing reference, Plaintiffs claim that statements on a subsidiary's website "misleadingly downplayed the inspection failure" by stating that the Indore plant produces oral solid drugs and was one of 26 Viatris facilities. ¶¶ 165, 167. To the extent this is a basis for Plaintiffs' claim, which is unclear, Plaintiffs have failed to identify the statements at issue, cannot claim that they are false, and, as statements on a subsidiary website, they "are not the type of statements upon which a reasonable investor would rely." *Mylan*, 2023 WL 3539371, at *9.

plaintiff cannot show the "statement 'was made with actual knowledge by [the speaker] that the statement was false or misleading.'" *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016). The Safe Harbor's prongs are disjunctive, so "any forward-looking statement is protected if it is *either* accompanied by 'substantive and tailored' cautionary statements *or* if the plaintiff fails to show 'actual knowledge of falsehood.'" *Id.* at 490-91.

Here, Smith and Mistras' statements about the anticipated "headwind" the Import Alert would have in 2025 are quintessential forward-looking statements, and either prong of the Safe Harbor immunizes them. *See, e.g.*, *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) (the "safe harbor is designed to shield statements like those regarding revenue projections and future business plans from leading to liability.").[14] The statements were identified as forward-looking and were accompanied by Viatris' extensive cautionary language. *See* Ex. 18 at 4; Ex. 19 at 2; Section I.A.2, *supra*. In addition, Plaintiffs do not meaningfully attempt to allege that Smith or Mistras had "actual knowledge"[15] that any characterization of the impact as a "headwind" was misleading. Setting aside the fact that the "headwind" predictions turned out to be correct, Plaintiffs do not allege facts to show that Viatris had either completed its discussions with the FDA or finished its analysis of the impact of the Import Alert when the statements were made.

Plaintiffs also challenge Viatris' statements that "[t]here could be the potential for additional exceptions" to the Import Alert (¶ 157, CS 20) and that it was "in active discussions with the FDA to add more products to the exempt list" (¶ 159, CS 21), arguing that the FDA would

---

[14] *See also, e.g.*, *Holland v. Standley*, 2025 WL 2434230, at *18 (E.D. Pa. Aug. 21, 2025) (statement about the "headwind" of "expected reduction in COVID-related benefits" was a forward-looking statement "safeguarded by the safe-harbor provision of the PSLRA").

[15] The "actual knowledge" standard in the Safe Harbor is a "more demanding standard" than the scienter requirement that applies to statements of current fact. *Avaya, Inc.*, 564 F.3d at 259 & n.29. It requires "'proof of knowing falsity.'" *Lewakowski v. Aquestive Therapeutics, Inc.*, 2023 WL 2496504, at *9 (D.N.J. Mar. 14, 2023).

not grant an additional exception for lenalidomide because "there was no shortage . . . under the FDA's standard[.]"  ¶ 158(b).  Because these statements speak to the possibility of a future exception, they are forward-looking.  *See, e.g.*, *Lewakowski*, 2023 WL 2496504, at *9; 15 U.S.C. § 78u-5(i)(1)(B-C).  The statements were accompanied by extensive cautionary language (Ex. 9 at 2; Ex. 19 at 2), and there is nothing alleged to suggest that any Defendant had actual knowledge—such as a communicated decision from the FDA—that would foreclose an exception.  Thus, either prong of the Safe Harbor applies, and this should end the analysis.

Nevertheless, to the extent the Court considers it, Plaintiffs' repeated refrain that there was "no realistic prospect"[16] of an FDA exception for lenalidomide has no basis in law or alleged fact. First, the law is clear that "when [Viatris] disclosed that adverse regulatory action was possible," *i.e.*, that it might not get an exception from the FDA, "it did not have a further obligation to predict that a negative outcome would actually occur."  *In re MGT Cap. Invs., Inc. Sec Litig.*, 2018 WL 1224945, at *13 (S.D.N.Y. Feb. 27, 2018) (collecting authorities).[17]  Second, Plaintiffs' assertion is based on the assumption that, because the FDA and ASHP databases did not reflect a current shortage of lenalidomide, there was no chance of an exception.  ¶¶ 95-119.  But Plaintiffs cannot show that a ***current*** shortage is the *sine qua non* for an exception.  In fact, that claim is easily disproven: Viatris ***did*** obtain exceptions for levothyroxine, fingolimod, atorvastatin calcium, and metformin hydrochloride based on shortage concerns (¶ 163; Ex. 17 at 137) and ***neither the FDA nor ASHP databases indicated shortages for any of those drugs***.  *See* Exs. 20, 21.  Plaintiffs' litigation-driven opinions about the likelihood of an exception should not be credited.

---

[16] ¶¶ 94, 123, 131(c), 151, 158(c), 160(a), 162, 177, 180, 226.

[17] *See also Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1141-42 (9th Cir. 1996) (statements in the context of regulatory proceedings do "not ordinarily invoke a duty to disclose or provide a basis for a securities claim"); *Habelt v. iRhythm Techs., Inc.*, 2022 WL 971580, at *7-9 (N.D. Cal. Mar. 31, 2022) (similar), *cert. denied*, 145 S. Ct. 144 (2024).

24

## III.   THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER

Because Plaintiffs fail to plead any actionable misstatement or omission, the Court need not reach the required element of scienter to properly dismiss the Complaint. However, scienter provides an independent ground for dismissal because Plaintiffs fall far short of pleading particularized facts giving rise to the required "strong inference" of scienter. *See supra*, Section I.

As an initial matter, Plaintiffs do not plead that Defendants had any motive to commit securities fraud. *See* ¶¶ 201-226, 242-243. The Complaint does not plead *any* personal benefit derived by the Defendants and, in fact, it notably lacks the most common form of motive allegation in securities fraud cases: it does not, and cannot, allege any of the Individual Defendants sold Viatris stock during the Class Period. In fact, Mr. Smith and Ms. Mistras *increased* their shareholdings during the Class Period, which directly undercuts scienter.[18] Where "there is no allegation . . . of insider trading by any of the individual defendants . . . it is difficult to perceive the motive of the individual defendants to temporarily inflate [the price of a company's] stock." *In re Freemarkets, Inc. Sec. Litig.*, 2000 WL 33914766, at *10 n.12 (W.D. Pa. Dec. 26, 2000).[19] The absence of motive is "significant," *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245-46 (3d Cir. 2013), because fraud without motive "'makes little economic sense.'" *In re Digital Island Sec. Litig.*, 357 F.3d 322, 331 (3d Cir. 2004); *see also, e.g.*, *City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013). Without motive, the Complaint can survive a motion to

---

[18] *See* Exs. 22-24; *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 572-73 (E.D. Pa. 2009) (that "Defendants . . . actually increased their holdings incrementally throughout the Class Period . . . raises a compelling inference *against* scienter.") (emphasis in original); *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 638 (D.N.J. 2002) (similar).

[19] *See also, e.g.*, *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *22 (D.N.J. Apr. 27, 2017) (failure to "mention . . . trading during the class period . . . casts doubt on [plaintiffs'] theory [of scienter]"), *aff'd*, 905 F.3d 106 (3d Cir. 2018); *Nat'l Junior Baseball League v. PharmaNet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 549-50 (D.N.J. 2010) (similar).

dismiss "only if [Plaintiffs] allege specific facts that constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 238 (3d Cir. 2004); *In re Rite Aid Corp. Sec. Litig.*, 2025 WL 968306, at *11 (E.D. Pa. Mar. 31, 2025) (same). Plaintiffs do not meet this burden.

***No Particularized Facts.*** The Complaint fails to plead any particularized facts to support scienter: it lacks any allegations regarding the existence of any internal reports or memoranda or statements of any witnesses, confidential or otherwise, suggesting that Defendants had knowledge that any challenged statements were false when they were made. This is a "fundamental deficiency that further undermines any inference of scienter." *See Lewakowski*, 2023 WL 2496504, at *12; *Rahman v. Kid Brands, Inc.*, 2012 WL 762311, at *23 (D.N.J. Mar. 8, 2012) (similar).[20] Instead, Plaintiffs make conclusory allegations based on the receipt of the Form 483 (¶ 206) and Viatris' remedial efforts and communications with the FDA thereafter (¶¶ 207-213). But, again, it is well-settled that Forms 483 contain observations, ***not*** violations. *See* Section II(A)(1), *supra*. And the fact that Viatris began remediation in response to the Form 483 does not establish scienter; rather, it shows that Viatris responded promptly to resolve the identified issues to obviate the need for, or minimize the scope of, FDA action. When that was unsuccessful, Viatris promptly disclosed the Warning Letter and Import Alert, undermining any inference of fraudulent intent. *See Genzyme II*, 754 F.3d at 44 (no scienter where company "timely and promptly disclosed" warning letter, "run[ning] counter to any inference of scienter"); *Abiomed*, 778 F.3d at 244 (similar).[21] Finally,

---

[20] *See also, e.g.*, *Martin*, 757 F. App'x at 154 (no inference of scienter where plaintiffs failed to plead the contents of reports or that the defendants actually received the reports); *In re Campbell Soup Sec. Litig.*, 2020 WL 7022655, at *7-8 (D.N.J. Nov. 30, 2020) (similar).

[21] Plaintiffs try to make much out of Viatris' post-Class Period statements to Piper Sandler analysts at a management dinner (¶ 210), but the report itself states only that management described four of the six Form 483 observations as "straightforward" and "the remaining 2 items as more challenging." Ex. 25. The report neither evidences that the FDA informed Viatris that it would

Plaintiffs' speculation about the contents of Defendants' post-Form 483 communications with the FDA (¶¶ 207-213)—which contain no particularized facts regarding any meetings, emails, or discussions—cannot support scienter. *Rahman*, 736 F.3d at 245-46 (no scienter where there was no "way of knowing what was discussed in those closed-door meetings").

Nor does the Warning Letter itself (¶¶ 214-219) support an inference of scienter. While the Warning Letter was addressed to Defendant Smith and stated that "executive management remains responsible" for ensuring cGMP compliance at Indore (¶¶ 215, 224), it does not contain any facts known to Smith or any Individual Defendant that were inconsistent with their public statements. *See* Ex. 10.[22] Plaintiffs' allegation that the Warning Letter provides a "basis to infer" that the Individual Defendants were informed of data integrity issues at Indore reported to the "global quality organization" in January 2024 (¶¶ 75, 202, 203) fails as well: there are no facts alleged regarding the nature or severity of the reported issues or that any Individual Defendant was made aware of them. *See Lewakowski*, 2023 WL 2496504, at *12.

***"Must Have Known" Allegations Fail***.   Without any particularized factual allegations showing actual knowledge of the falsity of any statement, Plaintiffs retreat to a series of allegations that amount to suppositions that Defendants "must have known" that their statements were false. Plaintiffs point to Defendants' (i) supervisory positions (¶¶ 204-205, 242-243); (ii) experience in the pharmaceutical industry and familiarity with regulations (¶¶ 222, 224-226); and (iii) purportedly holding themselves out as knowledgeable about Indore and the product lenalidomide (¶¶ 221, 224-226). Allegations that "because of [a defendants'] position within the company [the

---

not be able to remediate the issues at Indore nor that Viatris believed it would not be able to address the comparatively "more challenging" items. *Id.*

[22] Similarly, Defendant Smith's February 27, 2025 statement that "[w]e recently traveled to Indore to review the progress" concerning remediation does not reveal any information that Smith knew from that travel that was contrary to any statements made following the trip. *See* ¶ 216.

defendant] 'must have known' a statement was false or misleading are . . . 'inadequate'." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999).[23]  Nor does industry experience, or general knowledge of FDA regulations, support an inference of intent to defraud investors.  *See Provention Bio*, 2022 WL 3098236, at \*15 (defendants' "extensive experience in the pharmaceutical industry" did not support scienter) (collecting authorities).  Indeed, if industry experience were sufficient to plead scienter, the PSLRA's heightened pleading standard would be meaningless, as virtually all corporate officers are experienced in their industry.  Finally, Plaintiffs plead no facts to show any Individual Defendant held themselves out as having first-hand knowledge of information that contradicted their public statements.  *See In re Amarin Corp. PLC Sec. Litig.*, 2021 WL 1171669, at \*18 (D.N.J. Mar. 29, 2021) (rejecting scienter theory based on claim that statements implied first-hand knowledge of matter at issue), *aff'd*, 2022 WL 2128560 (3d Cir. June 14, 2022).

***No "Core Operations" Doctrine***.  Plaintiffs also attempt to invoke the "core operations" doctrine (*see* ¶ 220), which holds that where misrepresentations involve "'core matters' of central importance" to the corporation, a "'core operations inference'" may support scienter.  *See Martin*, 757 F. App'x at 155.[24]  But such an inference is unavailable "'absent some additional allegations of the specific information conveyed to management and related to the fraud.'"  *Id.* (same).[25]

---

[23] *See also, e.g.*, *In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 430 (D.N.J. 2005) ("[A]llegations that a defendant, by virtue of his position within a company, must have known about the alleged fraud have been deemed conclusory and inadequate"), *aff'd*, 500 F.3d 189 (3d Cir. 2007); *PharmaNet*, 720 F. Supp. 2d at 556 (rejecting allegation that defendants "certainly knew of the alleged illegal commercial practices . . . because they were high-ranking executives").

[24] Numerous courts, including the Third Circuit, have questioned whether the core operations theory is even viable under the PSLRA.  *See Rahman*, 736 F.3d at 246-47 (noting case recognizing "core operations" doctrine had "limited precedential value").  But even if it is, Plaintiffs have not alleged the requisite specific information conveyed to management related to the fraud.

[25] *See also, e.g.*, *Hoey v. Insmed Inc.*, 2018 WL 902266, at \*23 (D.N.J. Feb. 15, 2018) (no core operations inference without individualized allegations that defendants had knowledge of the facts

28

Moreover, although Plaintiffs point to lenalidomide's profitability to claim that Defendants "knew about . . . undisclosed problems" at Indore (*see* ¶¶ 32, 220, 222), Indore is just one of 26 Viatris facilities, and lenalidomide is just one of Viatris' 4,400 products.  *See* ¶¶ 30, 150.  *See Thomas v. Shiloh Indus., Inc.*, 2017 WL 1102664, at *4 (S.D.N.Y. Mar. 23, 2017) (rejecting core operations where a "facility [was] only one of . . . 21 facilities"). And the impact on 2025 financial guidance amounted to declines of only 1.75% in revenue and 4.55% in EBITDA.

  ***A "Holistic" Review Supports Only Non-Culpable Inferences.***  Having failed to offer any factual allegations to support an inference of scienter, only non-culpable inferences remain.  First, with respect to Viatris' waiting until receipt of the Warning Letter and Import Alert to disclose that the FDA had inspected Indore and issued inspection observations, "[i]t is more likely that defendants made no mention of the . . . Form 483 . . . given the observational nature of such forms[.]" *Genzyme II*, 754 F.3d at 42.  It is also entirely plausible and reasonable that Viatris did not immediately disclose the inspection at Indore and the Form 483 because it believed it could address the FDA's concerns.  *Id.* at 42-43; *Schaeffer v. Nabriva Therapeutics plc.*, 2020 WL 7701463, at *12 (S.D.N.Y. Apr. 28, 2020) ("reasonable" for Defendants to believe Form 483 observations "could be timely remedied").  Likewise, it is both plausible and reasonable for Defendants to take the time they needed to analyze the impact of the Import Alert, including by completing ongoing FDA discussions. *Genzyme II*, 754 F.3d at 44 (it is appropriate "to wait for a complete picture to become apparent before making any formal announcements."); *see also Stryker*, 865 F. Supp. 2d at 834 (similar).

  Perhaps most notably, Plaintiffs' theory of fraud is implausible.  According to Plaintiffs,

---

at issue); *PharmaNet*, 720 F. Supp. 2d at 556 ("'[I]t is not automatically assumed that a corporate officer is familiar with certain facts just because these facts are important to the company's business; there must be other, individualized allegations that further suggest that the officer had knowledge of the fact in question.'").

Defendants were aware at all relevant times that the FDA would inevitably issue the Import Alert covering lenalidomide and that Viatris would be unable to secure an exception.  But without any allegation of a motive, the theory that Defendants "would rather keep the stock price high for a time and then face the inevitable fallout" once these issues were inevitably revealed "***does not make a whole lot of sense***." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020).[26]  The Court should not "check [its] disbelief at the door," *Nguyen*, 962 F.3d at 415, because there is a far more plausible inference: Defendants were optimistic about addressing the Form 483 and, following that, the possibility of securing an exception for lenalidomide, and they promptly disclosed all relevant information to the market when that optimism and possibility did not pan out.  Viewed holistically, there can be no plausible inference of fraudulent intent on the facts alleged, let alone a "strong inference" that is "at least" as compelling as an inference of non-fraudulent intent.[27]

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Complaint be dismissed in full and with prejudice.[28]

---

[26] *See also Checkpoint*, 2025 WL 1434400, at *24 (no scienter where alleged fraud scheme was "'not coherent'" because defendants would have known that the FDA's rejection of defendant company's drug candidate "'would be revealed, in relatively short order'"); *Hills v. BioXcel Therapeutics, Inc.*, 2024 WL 3374145, at *17 (D. Conn. July 11, 2024) (similar).

[27] Plaintiffs' failure to plead scienter for the Individual Defendants, or for any other Viatris employee, forecloses any inference of scienter against Viatris.  *See Rahman*, 736 F.3d at 246 n.14 ("'the most straightforward way'" to plead scienter for a corporate defendant "'will be to plead it for an individual defendant.'").

[28] Because the Complaint does not adequately plead a Section 10(b) violation, the Section 20(a) claim against the Individual Defendants "must be dismissed." *See Pfizer*, 754 F.3d at 177.  In addition, to the extent that Plaintiff is bringing a securities fraud scheme claim based on Rule 10b-5(a) and 10b-5(c)—which is not apparent from the face of the Complaint (¶¶237-240)—that claim fails because Plaintiff fails to allege an actionable misstatement or scienter and, therefore, has not alleged any fraudulently deceptive conduct.

Dated: December 1, 2025              Respectfully submitted,

By: /s/ Gregory L. Watts
Gregory L. Watts (UT 17782) (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
95 S. State Street, Suite 1000
Salt Lake City, UT  84111
Telephone: (801) 401-8510
gwatts@wsgr.com

Nina F. Locker (*pro hac vice*)
Evan L. Seite (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 493-9300
nlocker@wsgr.com
eseite@wsgr.com

Sheryl Shapiro Bassin (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
31 West 52nd Street, Fifth Floor
New York, New York 10019
Telephone: (212) 999-5800
sbassin@wsgr.com

William Pietragallo, II (PA I.D. #16413)
Quintin DiLucente (PA I.D. #330648)
PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
Telephone: (412) 263-1818
wp@pietragallo.com
qd@pietragallo.com

*Counsel for Defendants Viatris Inc., Scott Andrew Smith, Theodora Mistras, and Corinne Le Goff*

31