**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**
**PITTSBURGH DIVISION**

| | |
|---|---|
| In re Viatris Inc. 2025 Securities Litigation | Civil Action No. 2:25-cv-00466-MJH |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

                                                                              **Page**

I.      INTRODUCTION ................................................................................................1

II.     STATEMENT OF FACTS ....................................................................................5

III.    LEGAL STANDARD...........................................................................................11

IV.     THE COMPLAINT ADEQUATELY PLEADS FALSITY.......................................11

        A.  Defendants Assured Investors of cGMP Compliance While Admitting

            Fabricated Data to the FDA .................................................................................11

        B.  Defendants Touted Stability, Dangled Exemptions, and Concealed

            Lenalidomide's Ban ...........................................................................................20

        C.  Defendants Cannot Recast Their Misrepresentations as Puffery, Inactionable

            Opinions, or Predictions.......................................................................................23

V.      THE COMPLAINT PLEADS A COMPELLING INFERENCE OF SCIENTER .....28

VI.     PLAINTIFFS ADEQUATELY ALLEGE SECTION 20(a) VIOLATIONS..............35

VII.    CONCLUSION...................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)..................................................................................25

*Alberici v. Recro Pharma, Inc.*,
2021 WL 798299 (E.D. Pa. Mar. 1, 2021)...............................................................26

*Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) .................................................................32, 34

*Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*,
660 F. Supp. 1362 (D. Conn. 1987).........................................................................27

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ...................................................................................18

*Barrie v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. 2005) ..................................................................................18

*Baxter v. MongoDB, Inc.*,
2026 WL 1192420 (S.D.N.Y. Apr. 30, 2026)...........................................................24

*Bishins v. Marinus Pharms., Inc.*,
2026 WL 686766 (E.D. Pa. Mar. 11, 2026)..............................................................23

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
2019 WL 3451523 (D.N.J. July 31, 2019)...............................................................33

*City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*,
865 F. Supp. 2d 811 (W.D. Mich. 2012) .................................................................20

*City of Warwick Ret. Sys. v. Catalent, Inc.*,
2024 WL 3219616 (D.N.J. June 28, 2024)...........................................................29, 33

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) ..................................................................................18

*Fin. Acquisition Partners LP v. Blackwell*,
440 F.3d 278 (5th Cir. 2006) ..................................................................................18

*Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*,
778 F.3d 228 (1st Cir. 2015)...................................................................................34

*Frater v. Hemispherx Biopharma, Inc.*,
   996 F. Supp. 2d 335 (E.D. Pa. 2014) .......................................................................15, 26, 27, 33

*Gimpel v. Hain Celestial Grp., Inc.*,
   156 F.4th 121 (2d Cir. 2025) ........................................................................................28

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023) ....................................................................................19, 28

*Gordon v. Dailey*,
   2018 WL 1509080 (D.N.J. Mar. 27, 2018).....................................................................11

*Gorlamari v. Verrica Pharms., Inc.*,
   2024 WL 150341 (E.D. Pa. Jan. 11, 2024)...............................................................11, 12, 33

*Hall v. Johnson & Johnson*,
   2019 WL 7207491 (D.N.J. Dec. 27, 2019).........................................................23, 24, 29, 30

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)................................................................................................23

*Hoey v. Insmed Inc.*,
   2018 WL 902266 (D.N.J. Feb. 15, 2018) ......................................................................34

*Howard v. Arconic Inc.*,
   2021 WL 2561895 (W.D. Pa. June 23, 2021)..................................................................23

*Howard v. Arconic Inc.*,
   395 F. Supp. 3d 516 (W.D. Pa. 2019).............................................................................35

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
   620 F. Supp. 3d 167 (D.N.J. 2022) ..................................................................... *passim*

*In re Able Lab'ys Sec. Litig.*,
   2008 WL 1967509 (D.N.J. Mar. 24, 2008)......................................................................32

*In re Adolor Corp. Sec. Litig.*,
   616 F. Supp. 2d 551 (E.D. Pa. 2009) .............................................................................29

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) .........................................................................................22

*In re Amarin Corp. PLC Sec. Litig.*,
   2021 WL 1171669 (D.N.J. Mar. 29, 2021).......................................................................33

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ..........................................................................31

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004) ...................................................................................31

*In re Celgene Corp. Sec. Litig.*,
2019 WL 6909463 (D.N.J. Dec. 19, 2019) ................................................................27, 30, 31

*In re Cell Pathways, Inc.*,
2000 WL 805221 (E.D. Pa. June 20, 2000) .....................................................................26, 35

*In re Checkpoint Therapeutics Sec. Litig.*,
2025 WL 1434400 (S.D.N.Y. May 19, 2025) .......................................................................20

*In re Coinbase Glob., Inc. Sec. Litig.*,
2025 WL 2779024 (D.N.J. Sep. 30, 2025) ............................................................................28

*In re Dentsply Sirona, Inc. Sec. Litig.*,
816 F. Supp. 3d 449 (S.D.N.Y. 2026) ...................................................................................22

*In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*,
2019 WL 1299673 (D.N.J. Mar. 21, 2019) ...........................................................................23

*In re Egalet Corp. Sec. Litig.*,
340 F. Supp. 3d 479 (E.D. Pa. 2018) ....................................................................................18

*In re: Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 15, 2015) ...........................................................................25

*In re Exscientia P.L.C. Sec. Litig.*,
2025 WL 2886489 (D.N.J. Oct. 10, 2025) ............................................................................24

*In re Genzyme Corp. Sec. Litig.*,
754 F.3d 31 (1st Cir. 2014) .....................................................................................12, 30, 34

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ................................................................ *passim*

*In re Lottery.com, Inc. Sec. Litig.*,
765 F. Supp. 3d 303 (S.D.N.Y. 2025) ...................................................................................24

*In re Maiden Holdings, Ltd. Sec. Litig.*,
153 F.4th 354 (3d Cir. 2025) ................................................................................................26

iv

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
  2015 WL 2250472 (D.N.J. May 13, 2015) ..................................................................25

*In re Mylan N.V. Sec. Litig.*,
  2023 WL 3539371 (W.D. Pa. May 18, 2023) ................................................. *passim*

*In re Novo Nordisk A/S Sec. Litig.*,
  2026 WL 2168296 (D.N.J. July 28, 2026) ..............................................................14, 32

*In re PTC Therapeutics, Inc. Sec. Litig.*,
  2017 WL 3705801 (D.N.J. Aug. 28, 2017) ...............................................................29

*In re Shanda Games Ltd. Sec. Litig.*,
  128 F.4th 26 (2d Cir. 2025) ......................................................................................25

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
  2017 WL 1658822 (D.N.J. Apr. 28, 2017) ...............................................................29

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
  2023 WL 9748644 (D.N.J. May 22, 2023) ................................................................22

*In re Viatris Inc. Sec. Litig.*,
  2024 WL 4252060 (W.D. Pa. Sep. 20, 2024) ..............................................22, 24, 26

*In re Viropharma Inc. Sec. Litig.*,
  21 F. Supp. 3d 458 (E.D. Pa. 2014) ...........................................................15, 27, 31

*In re Viropharma, Inc. Sec. Litig.*,
  2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) ..............................................................18

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) .................................................................... *passim*

*Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*,
  26 F.3d 375 (3d Cir.1994) ...................................................................................29, 30

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ..................................................................................20, 29

*Martin v. GNC Holdings, Inc.*,
  2017 WL 3974002 (W.D. Pa. Sep. 8, 2017) ............................................................24

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ..............................................................................................11, 18, 30

*McClain v. Iradimed Corp.*,
111 F. Supp. 3d 1293 (S.D. Fla. 2015) ................................................................20

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) .............................................................................22

*Odeh v. Immunomedics, Inc.*,
2020 WL 4381924 (D.N.J. July 31, 2020).......................................................... *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015).............................................................................................25

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000)................................................................................24

*Patel v. Koninklijke Philips N.V.*,
2024 WL 4265758 (E.D.N.Y. Sep. 23, 2024)..................................................24, 32

*Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
679 F.3d 952 (7th Cir. 2012) .............................................................................30

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
679 F.3d 972 (8th Cir. 2012) .........................................................................12, 17

*Salzman v. ImmunityBio, Inc.*,
753 F. Supp. 3d 1050 (S.D. Cal. 2024)........................................................15, 19, 24

*Schaeffer v. Nabriva Therapeutics plc*,
2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020)..................................................... *passim*

*Schaeffer v. Nabriva Therapeutics plc*,
No. 19-cv-04183, ECF No. 43 (S.D.N.Y.) .........................................................12, 18

*Schaeffer v. Nabriva Therapeutics plc*,
No. 19-cv-04183, ECF No. 49 (S.D.N.Y.) .........................................................12, 18

*Shah v. Zimmer Biomet Holdings, Inc.*,
348 F. Supp. 3d 821 (N.D. Ind. 2018) ...............................................................30

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019)..................................................................................24

*Skiadas v. Acer Therapeutics Inc.*,
2020 WL 4208442 (S.D.N.Y. July 21, 2020) .......................................................35

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010).................................................................................................20

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
  2022 WL 17740482 (D.N.J. Dec. 16, 2022)....................................................................25, 26

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007).....................................................................................................28, 29

*Thomas v. Shiloh Indus., Inc.*,
  2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017) ........................................................................34

*Todd v. STAAR Surgical Co.*,
  2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ..................................................................17, 34

*Tomaszewski v. Trevena, Inc.*,
  482 F. Supp. 3d 317 (E.D. Pa. 2020) ...................................................................14, 15, 19, 29

*Trs. Welfare & Pension Funds of Loc. 464A - Pension Fund v. Medtronic PLC*,
  2025 WL 2784543 (D. Minn. Sep. 30, 2025) ........................................................................20

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
  2015 WL 3755218 (E.D. Pa. June 16, 2015)........................................................................30

*Wu v. GSX Techedu Inc.*,
  738 F. Supp. 3d 527 (D.N.J. 2024) .....................................................................................33

## Statutes and Rules

17 C.F.R. §240.10b-5..................................................................................................11, 35

Securities Exchange Act of 1934..............................................................................................11

## I.    INTRODUCTION

Viatris Inc. ("Viatris" or the "Company") is a generic drug manufacturer that operates a facility in Indore, India, which produced a drug called lenalidomide during the Class Period (February 28, 2024 to February 26, 2025).  The Company can only legally manufacture drugs if it complies with current good manufacturing practices ("cGMP"), exacting conditions codified in federal regulations to ensure that drugs are safe and effective.  One key aspect of cGMP is data integrity: a drug manufacturer must keep its quality-testing records complete, consistent, accurate, and free from manipulation.

Viatris knows these requirements well.  This District previously sustained securities fraud claims against Viatris's predecessor, Mylan N.V., the legacy owner of the Indore facility, based on statements that contradicted cGMP violations identified in a Form 483 that the U.S. Food and Drug Administration ("FDA") issued in 2016 and 2018.  *See In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *4, *18 (W.D. Pa. May 18, 2023).  This case involves similar violations.  In 2019, the FDA inspected the Indore facility and issued a Form 483, citing cGMP violations.  Viatris never disclosed that Form 483, but FDA practice made it more likely that Indore would be reinspected.  In January 2024, Viatris's own internal audit discovered data integrity violations at Indore.  Despite these findings, Viatris took no corrective action at that time.

Instead, on February 28, 2024, weeks after its internal audit at Indore, Viatris filed its Annual Report on Form 10-K with the SEC (the "2023 10-K").  Defendant Scott Smith ("Smith"), Viatris's Chief Executive Officer, signed the 2023 10-K, which misleadingly assured investors that Viatris manufactured drugs under exacting conditions with a commitment to high quality, and described numerous risks, including the risk of adverse regulatory actions such as receiving Form 483s or warning letters as mere possibilities.  In May 2024, Viatris represented that all of its

1

facilities complied with cGMP.

But in June 2024, the FDA returned to Indore and documented severe cGMP violations. The inspection revealed systematic fabrication, including laboratory analysts certifying tests they never performed, recording lost samples as passed, and re-testing failing batches until they passed. In response, the FDA issued a Form 483. Senior managers at Indore were briefed daily during the June 2024 inspection. And they did not object to any of the FDA's findings.

What followed were two very different conversations. Privately, Viatris did not dispute the FDA's findings. Its July 18, 2024 letter to the FDA acknowledged the cGMP violations and informed the FDA that the Company had suspended new product releases, demonstrating its understanding of the gravity of the situation. Viatris promised that "[c]orporate leadership and senior management" would stay "closely involved," and set a remediation target of January 15, 2025, conceding that nearly six months were needed to correct the deficiencies. Publicly, however, Viatris repeated the same false and misleading statements made in the 2023 10-K without modification or correction in other SEC filings. Along with Smith, Defendant Theodora Mistras ("Mistras"), Viatris's Chief Financial Officer, signed the SEC filings incorporating the 2023 10-K's misleading statements.

On August 30, 2024, Viatris told the FDA that it had fired Indore's senior leadership and formed a Steering Committee to oversee remediation, chaired by the Chief Quality Officer ("CQO"), who reports directly to Smith. On October 18, 2024, the FDA designated the Indore inspection as Official Action Indicated ("OAI"), which meant that adverse regulatory action was forthcoming. The FDA informs companies about an OAI designation before formal action is taken. On October 30, 2024, the CQO wrote a letter to the FDA admitting that testing records were fabricated at Indore, the Company had been "testing into compliance," and the January 2024

2

data integrity violations that Viatris failed to correct were directly linked to the cGMP violations the FDA discovered in June 2024. None of these admissions were disclosed to investors. Instead, on November 7, 2024, Viatris made the same misleading statements about manufacturing rigor and the hypothetical consequences of cGMP violations in its SEC filings.

On December 19, 2024, the FDA issued a Warning Letter confirming that Viatris's corporate headquarters had known of cGMP violations since January 2024, and banned certain unidentified drugs produced at Indore, including lenalidomide. Defendants discussed the Warning Letter with investors only *after* the FDA made it public—but concealed that lenalidomide was banned, and was highly unlikely to qualify for an exemption. Pursuant to FDA regulations, exemptions are made only for drugs in shortage, and lenalidomide was not even close. Viatris's settlement with Bristol-Myers Squibb Company ("Bristol-Myers") limited Viatris to a single-digit share of the lenalidomide market, while Bristol-Myers could supply the entire market with Revlimid, the branded equivalent, and generic manufacturers remained free to supply lenalidomide.

Between December 2024 and February 2025, Defendants falsely minimized the damage from the Warning Letter by dangling the prospect of exemptions and downplaying the ban. To mislead investors into thinking it was minimal, they called it a "little bit of headwind" from "1 of 26" facilities, touting "active discussions" for more exemptions while steering analysts toward exempt drugs and away from lenalidomide. The market heard what Defendants intended. Analysts described the ban as a "small hiccup." On February 27, 2025, Viatris finally disclosed that lenalidomide was banned from importation into the U.S., and announced a $500 million reduction in revenue for 2025. Importantly, the guidance provided for 2025 was 4% lower than total revenue for 2024 at the midpoint. On this news, Viatris's stock fell 17.9% over two days.

3

The Second Amended Class Action Complaint (the "Complaint") pleads scienter with a rare asset: Defendants' private communications with the FDA. Crucial scienter allegations are uncontested. Defendants do not dispute that they: (a) knew of the OAI designation; (b) knew every fact establishing lenalidomide's ineligibility for an exemption; (c) agreed with the FDA's findings; and (d) took the violations so seriously that they purged Indore's leadership. Nor do Defendants address Smith's Class Period admission that he communicated with the FDA and received its feedback well before the truth was revealed, or Viatris's admission to analysts that it understood the severity of the deficiencies as early as June 2024. These concessions are bolstered by the CQO's direct reporting line to Smith, the Individual Defendants' industry experience, and the importance of lenalidomide and data integrity to Viatris's business.

Defendants respond to this record by asking this Court to adopt an unprecedented license for pharmaceutical companies to lie about Form 483s. Their lead argument—that Form 483s cannot form the basis of a claim—has been rejected by the overwhelming weight of authority in this Circuit and beyond, and by cases they cite. *Mylan* sustained claims based on Form 483 "observations." 2023 WL 3539371, at *15-16. And in *Schaeffer v. Nabriva Therapeutics plc*, the court held that omitted Form 483s were actionable, and sustained an amended complaint that established the seriousness of cGMP violations through expert opinions (including that of Todd Clark ("Clark"), the same expert Defendants disparage here). 2020 WL 7701463, at *2 (S.D.N.Y. Apr. 28, 2020). Both sides agree *Nabriva* states the law; the Court need only follow it. Defendants further ignore precedent to focus on literal truth and advanced knowledge of precise consequences of their actions, neither of which has ever been the measure of a viable claim. They insist that violations of federal regulations are not "violations" until the FDA formally says so, although the FDA said exactly that with both the Form 483 and the OAI designation. Yet, Defendants never

4

moderated their misleading statements.  They trivialize statements about drug safety as "puffery" and claim safe-harbor protection without identifying one cautionary statement (despite concrete facts showing they knew facts inconsistent with their misleading statements).  Nor do Defendants' opinion arguments help—the Complaint meets the standard for liability whether or not the statements are characterized as opinions.

On scienter, Defendants demand a checklist (confidential witnesses, stock sales, internal documents) that the Third Circuit has already rejected in favor of a case-by-case approach.  Still, the Complaint describes internal documents: Defendants' own letters to the FDA.  Defendants say the letters identify no individuals, but one is signed by the CQO and others repeatedly refer to corporate leadership's and senior management's close involvement.  Defendants' concocted competing inferences—including prompt disclosure, diligent remediation, and good faith—are disproven at every step by the chasm between their nonpublic admissions to the FDA and their misleading statements.  The Complaint pleads a strong inference of scienter.  Therefore, Defendants' motion should be denied in full.

## II.    STATEMENT OF FACTS

*Background.*  Viatris is a global manufacturer of generic drugs or therapeutic equivalents of branded drugs.  ¶¶30-31, 33.[1]  Among its most profitable products is lenalidomide, the generic version of Bristol-Myers' branded drug Revlimid.  ¶32.  Because of its unusually high margins, lenalidomide was critical to Viatris's success during the Class Period, and the Company publicly touted the drug as an "important growth driver."  ¶¶32-36, 166.

*Oversight of Drug Quality.*  cGMPs are codified in federal regulations.  ¶¶40, 45-51, 59-

---

[1] "¶__" and "¶¶__" citations are to the Complaint filed at ECF No. 73.  "DM" refers to Defendants' Motion to Dismiss the Complaint, ECF No. 82.  All internal quotation marks and citations are omitted and emphasis is added unless otherwise noted.

60, 64-66.  Some of the most critical practices relate to data integrity designed to ensure that quality-testing is complete, consistent, accurate, and free from manipulation.  ¶¶38-48.  When the FDA identifies cGMP violations, it issues the company a Form 483 documenting the violations, and discusses the findings with senior management.  ¶¶49-51.  Form 483s are not readily available to the public, and investors learn about them only if a company discloses them or if investors obtain them on their own.  ¶52.  When a company cannot be relied upon to correct violations voluntarily, the FDA classifies an inspection as OAI—a designation companies learn of in advance, and which results in a warning letter, import alert, or other regulatory action 75% of the time.  ¶¶52, 56, 89.

*Import Bans and the Shortage Exemption.*  Drugs manufactured at facilities that violate cGMP can be banned from importation into the U.S.  ¶¶122-124.  Federal regulations exempt a drug from an import ban only when there is a shortage, after accounting for all of the drug's forms, brand-name, and generic alike.  ¶¶125-131.  Lenalidomide was not eligible for such an exemption. Based on its settlement with Bristol-Myers, Viatris could sell only a single-digit percentage of the market, while Bristol-Myers could produce unlimited quantities of Revlimid, the branded equivalent of lenalidomide.  ¶¶132-135, 149-150.  During the Class Period, demand for lenalidomide was falling, at least ten other companies sold the drug, and it never appeared on the FDA's shortage list.  ¶¶136-151.  Data from the American Society of Health-System Pharmacists ("ASHP") confirmed that Revlimid and lenalidomide were widely available throughout 2024 and 2025.  *Id*.

*The 2019 Form 483 and the January 2024 Audit.*  Lenalidomide was manufactured at a facility in Indore, India.  ¶¶32, 37, 53.  In October 2019, the FDA inspected Indore and issued a Form 483 that identified cGMP violations.  ¶¶53-56.  Under the FDA's risk-based inspection criteria, Indore's poor compliance history made it a likely reinspection target.  ¶¶55-56.  In January

2024, Viatris conducted an undisclosed internal audit of Indore and discovered data integrity violations.  ¶57.  As Viatris later admitted to the FDA, it failed to "adequately investigate and address" those violations.  ¶¶57, 84, 95.

*Defendants Tout Quality While Concealing What They Found.*  On February 28, 2024, Viatris filed the 2023 10-K assuring investors that "[m]anufacturing is conducted under exacting conditions" with "strict . . . specifications and controls," touting Viatris's "strong commitment to quality," and describing quality-inspection risks as merely hypothetical, or as having occurred at an unspecified time and place "in the past."  ¶¶160-175.  Viatris repeated these representations verbatim after the June 2024 Form 483 was issued, after the OAI designation, and after its own private admissions to the FDA conceding data integrity violations at Indore.  ¶¶177-179, 184-186. On May 21, 2024, Viatris told investors that all operations "are executed in alignment with" cGMP under "robust quality" systems "designed to ensure product quality and patient safety."  ¶¶163-165.

*The FDA Catches Data Fabrication at Indore.*  In June 2024, the FDA inspected Indore and issued an 18-page Form 483, identifying six categories of cGMP violations, including severe and pervasive data integrity violations.  ¶¶58-66.  Indore employees had fabricated the quality-testing records meant to prove Viatris's drugs are safe: they certified tests that were never performed, recorded lost samples as passing, and re-tested failing batches until they passed.  ¶¶59-61.  During the inspection, the FDA investigator observed a manager "quickly putting away documents," and when produced, the documents showed numbers "overwrit[ten]" and "scrubb[ed]" in ink.  ¶62.  Viatris's senior managers on site agreed that the misconduct violated the Company's own policies.  ¶63.  The FDA's subsequent Establishment Inspection Report ("EIR") recorded that Indore's senior management knew about the deficiencies and did not object

7

to the FDA's findings.  ¶¶67-70.

*Private Admissions and Public Reassurances.*  On July 18, 2024, Viatris responded to the FDA by acknowledging the deficiencies, suspending releases of new product batches from Indore, committing that "*[c]orporate leadership and senior management*" would stay "*closely involved*" in remediation, and setting a target completion date of *January 15, 2025*—near the end of the Class Period.  ¶¶71-80, 242.  Three weeks later, Viatris's August 8, 2024 Form 10-Q again repeated the same misleading statements from the 2023 10-K verbatim.  ¶¶178-181.

On August 20, 2024, the FDA initially classified the Indore inspection as OAI.  ¶81.  The FDA informs companies about their OAI status in advance of any formal regulatory action.  ¶89.  On August 30, 2024, Viatris told the FDA in a letter that it had suspended testing and product releases, terminated high level managers at Indore, and created a Steering Committee led by the CQO to oversee remediation efforts.  ¶¶82-87.  The CQO reports directly to Smith.  ¶73 n.27.  On October 18, 2024, the OAI classification became final.  ¶¶88-89.  Nevertheless, a week later, Viatris's October 25, 2024 Proxy Statement assured investors that "every step" of Viatris's manufacturing "is grounded in our commitment to good manufacturing practices and the quality and safety of our products."  ¶182.

On October 30, 2024, Viatris's CQO admitted in a letter to the FDA that testing records at Indore had been fabricated, the Company had been "testing into compliance" in violation of cGMP, data at Indore was not recorded contemporaneously, and the deficiencies Viatris discovered in January 2024 had persisted because Viatris failed to timely investigate and address them.  ¶¶90-95.  Eight days later, Viatris's November 7, 2024 Form 10-Q repeated the same misleading statements from the 2023 10-K without any modification or correction.  ¶¶184-186.

*The "Stability" Ruse.*  On November 21, 2024, Smith told investors that Viatris's "165

8

countries, 4,400 different products" provided an "incredible base of stability," specifying that "not one product in any one geography really changes the needle," and Mistras cited "the kind of stability that we've kind of seen in the base business," and endorsed 2024 results as a reasonable baseline for 2025. ¶¶187-190. Analysts relied upon these statements: a December 16, 2024 Jefferies report "came away confident" that Viatris's consecutive quarters of growth were "sustainable into 2025." ¶191.

*The Warning Letter and Import Alert.* On December 19, 2024, the FDA issued the Warning Letter, demanding Company-wide corrective actions for the data integrity violations. ¶¶102-108. The Warning Letter confirmed that Viatris knew of the violations since January 2024, yet failed to correct them, and that Viatris's post-inspection remediation was also "inadequate." ¶¶109-111. The FDA also issued an Import Alert banning importation of drugs from Indore, but did not publicly identify which drugs remained prohibited absent an exemption. ¶193 n.55. On December 23, 2024, forced to speak by the FDA's publication of the Warning Letter, Viatris disclosed the Indore inspection, stating that eleven drugs were affected, four were exempt, and that additional exemptions were possible. ¶¶193-195.

*Defendants Downplay the Import Ban.* On January 14, 2025, Smith downplayed the Import Alert as merely "a little bit of headwind," repeatedly emphasized that Indore was only "1 of 26" manufacturing facilities, claimed Viatris was "in active discussions with the FDA to add more products to that exempt list," and acknowledged being "in close communication with the FDA and receiving initial FDA feedback some months ago." ¶196. Mistras affirmatively refused to provide details about any specific products, and Defendant Corinne Le Goff, Viatris's Chief Commercial Officer, described lenalidomide as "a stable component of our generic portfolio." ¶¶196-197. Management then told Barclays analysts that no complex products were impacted and

blamed the "holiday season" for the absence of additional exemptions. ¶¶198-199. And management identified for UBS the "key products" impacted by the Warning Letter—naming levothyroxine, a drug the FDA had already exempted—while omitting any discussion of lenalidomide, which appeared nowhere among the 21 products in UBS's published impact assessment. ¶¶200-202. As a result, UBS was misled to believe that the "[i]mpact seems small"— just a "small hiccup." ¶¶203-204.

*The Truth Emerges.* On February 27, 2025, Viatris disclosed that lenalidomide was banned from importation and that the Import Alert was a substantial factor in reducing 2025 revenue by $500 million and 2025 EBITDA by $385 million. ¶¶205-217. Importantly, Defendants slashed revenue guidance for 2025 to eliminate all growth, and projected sales to be approximately 4% lower than in 2024 at the midpoint. ¶221. On this news, Viatris's share price fell 17.9% over two trading days on unusually high trading volume. ¶218. Analysts reacted with shock, explicitly questioning why Defendants omitted any discussion of lenalidomide when they previously spoke about the import ban and exemptions just a few weeks earlier. ¶¶213, 219-234. Defendants admitted after the Class Period that they understood the severity of the Indore deficiencies as early as June 2024, and that remediating certain deficiencies would be "more challenging." ¶261.

*Expert Analysis Solidifies the Claims.* The Complaint is bolstered by the analysis of Mr. Clark, a pharmaceutical industry and regulatory expert. Clark states that the cGMP violations at Indore made an OAI classification and enforcement action likely; that the length and tenor of the Form 483 and Warning Letter reflected especially severe violations; that Viatris's correspondence and remediation efforts demonstrated its agreement with the FDA's findings; and that, given the market dynamics for Revlimid and lenalidomide, any exemption from the import ban was extremely unlikely. ¶¶118-121, 156-158.

10

## III.    LEGAL STANDARD

At this stage, Plaintiffs "need only allege enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011).  The Court must accept all allegations as true and construe them in a light most favorable to Plaintiffs. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252, 264 n.36 (3d Cir. 2009).

Plaintiffs do not need to plead evidence to survive dismissal.  *See, e.g.*, *Gordon v. Dailey*, 2018 WL 1509080, at *2 (D.N.J. Mar. 27, 2018).  Critically, the Third Circuit has explicitly rejected a categorical approach to analyzing securities fraud claims—the approach that Defendants repeatedly but erroneously ask the Court to apply here—and has instead held that courts must apply a totality-of-the-circumstances test and evaluate each case on its own facts.  *See Avaya*, 564 F.3d at 268-69.

Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 prohibit both the making of false or misleading statements and omitting material facts necessary to ensure that the statements made are not misleading.  15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5.  The elements of a §10(b) claim are: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and a securities transaction; (4) reliance; (5) economic loss; and (6) loss causation.  *Matrixx*, 563 U.S. at 37-38.  Defendants only challenge falsity and scienter.  But the Complaint adequately pleads both of those elements.

## IV.    THE COMPLAINT ADEQUATELY PLEADS FALSITY

### A.  Defendants Assured Investors of cGMP Compliance While Admitting Fabricated Data to the FDA

Courts in this Circuit have repeatedly upheld securities fraud claims when a defendant's statements are inconsistent with issues identified in a Form 483.  *See, e.g.*, *Gorlamari v. Verrica Pharms., Inc.*, 2024 WL 150341, at *8 (E.D. Pa. Jan. 11, 2024) (finding that falsity was sufficiently

11

pled where, like here, Form 483 identified cGMP violations); *Mylan*, 2023 WL 3539371, at *18 (upholding claims where Form 483's "observations" contradicted defendant's public statements); *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *6-7 (D.N.J. July 31, 2020) (denying dismissal when, like here, the Form 483 listed serious data integrity violations).  And while the Third Circuit has not spoken on the issue, the Eighth Circuit has held that a Form 483 can render a defendant's statements misleading based on "the number, severity, and pervasiveness of objectionable conditions noted, as well as whether a company has failed to address or correct the deficiencies noted by the FDA."  *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 982-83 (8th Cir. 2012).  The First Circuit has also recognized that Form 483s can be material depending on the circumstances.  *See In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 42 n.4 (1st Cir. 2014).

Defendants' effort to minimize the Form 483 is contradicted by their own authorities. Defendants say that a Form 483 need not be disclosed because it identifies "observations," not "violations," but the court in *Mylan* upheld claims based on "observations."  2023 WL 3539371, at *18.  Defendants cite *Nabriva*, but that case undermines their arguments.  2020 WL 7701463, at *2.  In *Nabriva*, the court ruled that a failure to disclose information contained in Form 483s is actionable if disclosure is necessary to ensure that a defendant's statement is not misleading.  *Id.* at *9.  After concluding that the cGMP violations identified in the Form 483 rendered defendants' statements misleading, the court dismissed the complaint with leave to amend because it was unclear whether a strong inference of scienter was sufficiently pled.  *Id*. at *9-10.  Plaintiffs then filed an amended complaint, bolstering their allegations **with Clark's analysis** to explain the significance of cGMP violations.  *See Schaeffer v. Nabriva Therapeutics plc*, No. 19-cv-04183, ECF No. 43 (S.D.N.Y.).  Based on two expert opinions, including Clark's, the court found that plaintiffs had sufficiently alleged securities fraud claims.  *Id.* at ECF No. 49.

12

The parties agree that *Nabriva* correctly states the law.  The Court can therefore resolve much of this motion by following all of *Nabriva*.  There, the court exhaustively surveyed the case law and concluded that any one of the following supports sustaining Form 483-based claims: (1) numerous, severe, and pervasive objectionable conditions; (2) a pattern of unresolved, negative FDA feedback; (3) a failure to correct known deficiencies; (4) a likelihood of FDA enforcement action; and (5) statements suggesting cGMP compliance that are inconsistent with the Form 483. *Nabriva*, 2020 WL 7701463, at *8-9, 11, 13.  The Complaint pleads each factor.

First, the data integrity breach was severe.  *Id.* at *9.  The June 2024 Form 483 identified numerous, serious cGMP violations.  ¶¶59-66.  At Indore, Viatris's employees fabricated the quality-testing records meant to prove its drugs were safe.  Employees certified tests that were never performed, recorded lost samples as passing, and re-tested failing batches until they passed. ¶¶59-61.  Viatris knew about this misconduct from its own January 2024 internal audit, but left it unaddressed until an FDA investigator caught a manager concealing altered records during the June 2024 inspection.  ¶¶57, 62-63.  Courts in this Circuit have sustained claims based on similar facts.  *See, e.g.*, *Odeh*, 2020 WL 4381924, at *3 (denying dismissal of statements concealing data integrity violations including misrepresenting test procedures and backdating batch records).

Second, the cGMP violations at Indore were not isolated lapses, but were part of a persistent and unresolved pattern.  An inspection in 2019 resulted in the issuance of a Form 483 that identified cGMP violations, ¶54, increasing the risk of reinspection and negative consequences.  ¶56.[2]  Third, Viatris failed to correct the known deficiencies.  In January 2024,

---

[2] Defendants respond that the FDA ultimately classified that inspection as Voluntary Action Indicated ("VAI"), but that misses the point.  DM at 17.  The VAI designation does not establish that the Indore facility complied with cGMP.  It simply reflected the FDA's decision to rely on voluntary corrective action, rather than recommend immediate enforcement action at that time.

Viatris discovered them but did nothing. ¶57. It admitted to the FDA that the violations identified in January 2024 persisted and were confirmed in a new audit conducted by the Company in July 2024. ¶¶84, 95, 110, 111. Between June 2024 and October 2024, Viatris repeatedly admitted the cGMP violations to the FDA, claimed to take the matter seriously, and recognized it needed to implement corrective action. ¶¶67-101. Fourth, the likelihood of enforcement action increased on August 20, 2024, when the FDA classified the June 2024 inspection as OAI, meaning that regulatory action was forthcoming. ¶81. The OAI designation became final no later than October 18, 2024, ¶89, but Defendants continued to make misleading statements inconsistent with their cGMP violations after this date. *See*, *e.g.*, ¶¶182, 185. On December 19, 2024, the FDA issued the Warning Letter concluding that the serious data integrity violations had not been corrected. ¶¶102-118.

Finally, Defendants' public statements were inconsistent with the June 2024 Form 483 and the admissions they privately made to the FDA. A duty to disclose arises when a prior statement is inaccurate, incomplete, or misleading. *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 330 (E.D. Pa. 2020). "Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Id.*; *In re Novo Nordisk A/S Sec. Litig.*, 2026 WL 2168296, at *15 (D.N.J. July 28, 2026) ("If a defendant makes an affirmative statement or characterization about its business, it puts that subject in play and assumes a duty, under the securities laws, to speak truthfully about that subject."). Thus, when a company elects to speak about its communications with the FDA, there is an obligation to tell the full truth and disclose material information to investors. *See Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 189 (D.N.J. 2022). Securities fraud claims are adequately pled when a defendant's statements

14

are undermined by the FDA's negative feedback. *Id.* at 187-88; *Trevena*, 482 F. Supp. 3d at 330-31 (omission of the FDA's disagreement made positive statements about drug approval actionable); *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 472 (E.D. Pa. 2014) (finding that the FDA's concerns about clinical studies rendered defendants' optimistic statements misleading); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 345-47 (E.D. Pa. 2014) (similar).

The Complaint pleads false and misleading statements consistent with these principles. On February 28, 2024, after discovering—yet failing to address—the data integrity violations a month earlier, Viatris filed the 2023 10-K. ¶¶57, 160. That document contained misleading statements about how manufacturing was conducted "under exacting conditions," ¶161, and misleadingly presented regulatory risks related to cGMP violations as purely hypothetical, ¶171. Viatris was required to disclose the data integrity violations it had already discovered but failed to rectify once it put manufacturing and its commitment to quality "in play." *See Dickinson*, 620 F. Supp. 3d at 188. Viatris's characterizations of cGMP violations as hypothetical risks were likewise misleading because the Company was already in violation of cGMP. *See Odeh*, 2020 WL 4381924, at *6-7 (concluding that describing the risk of a data integrity breach as hypothetical was misleading when there was already a breach); *Salzman v. ImmunityBio, Inc.*, 753 F. Supp. 3d 1050, 1065-66 (S.D. Cal. 2024) (similar concerning risk of general compliance with cGMP).

On May 21, 2024, Defendants represented that Viatris's operations were "executed in alignment with" cGMP. ¶163. That misrepresentation was directly contradicted by Viatris's own findings in its January 2024 audit, and the cGMP violations that existed at Indore at that time. ¶¶67-80, 95; *see Nabriva*, 2020 WL 7701463, at *12 (explaining that statements that contradict a Form 483 are actionable). In July 2024, Viatris conducted another audit which confirmed that the

15

data integrity violations discovered in January 2024 persisted. ¶84. That same month, the Company suspended the release of drugs from Indore, in recognition of the seriousness and urgency of the cGMP violations. ¶82; *see Dickinson*, 620 F. Supp. 3d at 187 (observing that the urgency with which a company responds to the FDA's criticisms and concerns demonstrates an understanding of the gravity of the problem). Nevertheless, on August 8, 2024, Defendants again made misleading statements to investors, and repeated the false statements from the 2023 10-K without modification or correction. ¶¶179-181.

On October 18, 2024, the OAI designation became final, making it virtually certain that the FDA would take regulatory action. ¶89. On October 30, 2024, Viatris's CQO sent a letter to the FDA admitting that testing records at Indore were fabricated, ¶91, testing was manipulated to give the appearance of compliance, ¶92, and data was not recorded contemporaneously—just as the June 2024 Form 483 had found. ¶93. The October 30, 2024 letter listed the corrective actions Viatris had purported to take, including training employees on data integrity, consulting with third party experts, and terminating sixteen senior employees at Indore. ¶¶96-98. Still, one week later on November 7, 2024, Defendants filed a Form 10-Q repeating the same false and misleading statements in the 2023 10-K without modification or correction. ¶¶184-186.

Defendants largely ignore the immense detail and high degree of specificity pled in the Complaint. Instead, they ask the Court to find that there could be no cGMP violations until Viatris received the Warning Letter on December 19, 2024. DM at 12-13. This fiction ignores well-pleaded facts and contradicts the law. cGMP is codified in federal law, and the Complaint explains in detail how each of the "observations" in the June 2024 Form 483 constituted violations of federal regulations. ¶¶45-51, 59-60, 64-66. Nothing in the federal regulations suggests that Defendants can claim to be in compliance when they are not, or that no cGMP violation counts until

16

documented in a Warning Letter.  Defendants' nonsensical argument has been rejected repeatedly by courts within this Circuit and elsewhere.  *See, e.g.*, *Dickinson*, 620 F. Supp. 3d at 187 (holding that the absence of a warning letter does not provide a license to mislead investors); *see also KV Pharm.*, 679 F.3d at 976 (explaining that Form 483s are issued to "top management" to explain objectionable conditions at the site or other "violations."); *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *12 (C.D. Cal. Apr. 12, 2016) ("[N]either a Form 483 nor a Warning Letter is necessary to impute knowledge of the violations observed during an FDA inspection.").  Defendants' argument is further undermined by the material they seek to introduce from outside the Complaint.  DM at 13.  The 2025 FDA Investigations Operations Manual (the "Investigations Manual") that Defendants cite states that inspectors should identify significant deviations from federal statutes and regulations.  Defs.' Ex. 5 at §5.5.11.  That the Investigations Manual cautions inspectors to avoid the word "violative" until the FDA makes a final decision does not prevent the Court from determining whether documented cGMP violations were inconsistent with FDA regulations.  *Id.*  Regardless, Defendants continued to mislead investors after the FDA issued its final decision on October 18, 2024.  ¶89.

Defendants' contention that they were free to conceal the cGMP violations and negative FDA feedback while they tried to quickly address the violations is contradicted by their own communications with the FDA.  DM at 13-14.  In July 2024, Defendants told the FDA that it would take months to implement corrective actions, and provided a target completion date of January 15, 2025—near the end of the Class Period.  ¶75.  Defendants admitted that they did not make "significant progress" in their purported remediation efforts until October 30, 2024, DM at 14, rendering their statements between July 3, 2024, and October 25, 2024, materially misleading when made.  ¶¶176-183.

17

Conjecture about Defendants' subjective beliefs concerning "prompt corrective action" cannot justify misleading investors. *Compare* DM at 15 *with Matrixx*, 563 U.S. at 49 n.15 (holding that intent to carefully investigate concealed issues did not excuse making false statements). Plaintiffs do not need to provide detailed evidence concerning Viatris's discovery of data integrity violations in January 2024. *Compare* DM at 15 *with Dickinson*, 620 F. Supp. 3d at 189 n.20 (rejecting the same argument because particularity does not require "a cataloging of facts."). What matters is that Defendants themselves linked the January 2024 audit to the June 2024 Form 483 in July 2024, but continued to make misleading statements thereafter. *See supra* at 15-16.

Defendants' baseless attacks on Clark are inappropriate on a motion to dismiss, and fail on their own terms. DM at 16. Their own authority credited Clark's opinions to uphold securities fraud claims. *See Nabriva*, 19-cv-04183, ECF Nos. 43, 49. Indeed, courts routinely credit expert opinions at the pleading stage when considering both falsity and scienter. *See, e.g.*, *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257-58 (5th Cir. 2005) (reversing dismissal where plaintiff's claims of improper revenue recognition were supported by expert analysis); *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 930-32 (9th Cir. 2023) (reversing dismissal primarily based on expert account that demonstrated falsity).[3]

In any event, Defendants cannot challenge Clark's opinions concerning the significance

---

[3] The cases Defendants cite to urge the Court to disregard Clark's opinions are inapposite. In *Fin. Acquisition Partners LP v. Blackwell*, the Fifth Circuit merely held that the lower court did not abuse its discretion in striking an affidavit attached to a complaint. 440 F.3d 278, 285-86 (5th Cir. 2006). Plaintiffs here have not submitted an expert affidavit. *See also In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at *2 (E.D. Pa. Apr. 7, 2003) (considering facts alleged in complaint but not expert report itself). *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.* is not "similar." DM at 16 n.9 (citing 28 F.4th 343, 354 (2d Cir. 2022)). There, the Second Circuit held that a securities fraud complaint's allegations could be bolstered by an expert's non-conclusory allegations. *Id.* And in *In re Egalet Corp. Sec. Litig.*, the expert opinions were disregarded because they were irrelevant. 340 F. Supp. 3d 479, 510-11 (E.D. Pa. 2018). That is not the case here.

18

and severity of the cGMP violations because both are confirmed by their own concealed communications with the FDA.  ¶¶120-121.  Clark's observation that Form 483s are significant because they are sent to upper management does not undermine his opinions (DM at 16), because the FDA has said the same thing.  ¶¶51-52.  And courts in this Circuit have rejected Defendants' claim that Form 483s are insignificant or immaterial.  *See supra* at 16-17.  Defendants' contention that the number of cGMP violations is not indicative of the violations' seriousness is likewise contradicted by their own authority.  *Compare* DM at 15-16 *with Nabriva*, 2020 WL 7701463, at *8-9.  The same authority also rejects Defendants' invitation to disregard Viatris's history of recurring cGMP violations.  *Id.*

Whether Defendants knew with certainty that the FDA would issue the Warning Letter is a red herring.  DM at 17.  What matters is that Defendants misled investors about the ***increased risk*** of receiving the Warning Letter.  *See Trevena*, 482 F. Supp. 3d at 334 (rejecting the same argument).  The claims here likewise are not tethered to any statement suggesting that Viatris had never faced adverse regulatory action in the past.  DM at 18.  Rather, the Complaint pleads that Viatris concealed the ongoing cGMP violations at Indore during the Class Period, which rendered the 2023 10-K's discussion of generic hypothetical risks and unspecified adverse events at unspecified places and times materially misleading when made.  *Compare* DM at 18-19 *with Odeh*, 2020 WL 4381924, at *6-7; *ImmunityBio*, 753 F. Supp. 3d at 1065-66.

The 2023 10-K's repetitive reference to unspecified prior Form 483 letters is meaningless because Defendants never updated this purported disclosure even though the ground substantially shifted at Indore during the Class Period.  *Compare* DM at 18-19, *with* ¶¶177, 179, 185; *see Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 780 (9th Cir. 2023) (holding that a failure to update risk disclosures to reflect new information renders them meaningless and misleading).

19

"The consistency of the [D]efendants' language over time despite the new information they received . . . belies any contention that the cautionary language was tailored to the specific future projection." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 773 (2d Cir. 2010); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 245 (5th Cir. 2009) (same); *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *17-18 (E.D. Pa. Mar. 25, 2020) (same). *Mylan* does not hold otherwise. DM at 19. In *Mylan*, the court did not address whether the disclosures were sufficient in light of changed circumstances. 2023 WL 3539371, at *11-12. The law is clear that a failure to update risk disclosures in light of new, adverse information is actionable.[4]

**B. Defendants Touted Stability, Dangled Exemptions, and Concealed Lenalidomide's Ban**

Pursuant to FDA regulations, a drug can be exempted from an import ban only if the ban would cause a shortage of that drug in all of its forms, branded and generic alike. ¶¶125-128, 131. Lenalidomide could never meet this test: Viatris's own settlement with Bristol-Myers ensured that Bristol-Myers would dominate the market, producing unlimited quantities of branded Revlimid while Viatris was limited to a ***single-digit*** market share. ¶¶132-135, 149-150. Additionally, demand was falling, at least 10 other generic makers had ramped up production, and lenalidomide never appeared on the FDA's shortage list. ¶¶137, 149-151. The cited expert, Clark, confirmed

---

[4] None of the out-of-Circuit cases Defendants cite support dismissal. First, none backs Defendants' sweeping position that allegations based on Form 483s are categorically inactionable. *In re Checkpoint Therapeutics Sec. Litig.* involved a Form 483 related to the facility of a different company, and, unlike here, did not result in any adverse regulatory action. 2025 WL 1434400, at *23 (S.D.N.Y. May 19, 2025). *Trs. Welfare & Pension Funds of Loc. 464A - Pension Fund v. Medtronic PLC* observed that violations at a single plant could be significant and disclosure required, especially when the defendant claimed compliance with regulations. 2025 WL 2784543, at *6, 20 (D. Minn. Sep. 30, 2025). That is precisely what Defendants did here. In *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, the underlying issues were unrelated to the violations. 865 F. Supp. 2d 811, 825 (W.D. Mich. 2012). And unlike here, the defendants in *McClain v. Iradimed Corp.* immediately disclosed the receipt of the Form 483, including its contents. 111 F. Supp. 3d 1293, 1298-99 (S.D. Fla. 2015).

that an exemption was extremely unlikely. ¶¶156-158. Defendants therefore knew that if Viatris's product vanished, no patient would go without the drug. Importantly, Defendants do not contest that they knew all of these facts. *Compare* ¶273 *with* DM at 28-35.

Despite their knowledge and awareness of the cGMP violations at the facility where lenalidomide was produced, Defendants touted the stability of Viatris's generic business and affirmatively represented that "not one product" "really changes the needle." ¶¶187-191. After Defendants were forced to disclose the Warning Letter, they misled investors to believe that additional exemptions were possible, ¶¶194-195, said the import ban at Indore was merely a "little bit" of a "headwind," and falsely represented that they were not able to disclose details about specific products. ¶¶196-197. Defendants also told analysts that "no complex products" were impacted, ¶¶198-199, and omitted any mention of lenalidomide from their discussion of "key products impacted" by the ban. ¶¶200-202. These misrepresentations had their intended effect. The market was misled to believe that the cGMP violations were "a small hiccup" with a "small" impact. ¶¶203-204; *see also* ¶213 (analyst questioned how the financial hit to Viatris can be squared with Defendants' prior misleading representations about manufacturing hundreds of products); ¶¶219-234 (expressing surprise and "shock" at the ultimate financial impact from the import ban given Defendants' prior disclosures that minimized the Warning Letter).

In addressing these misrepresentations, Defendants ignore what investors heard clearly. No additional time was needed to know that lenalidomide could not qualify for an exemption given the absence of a shortage and Viatris's insignificant role in the drug's market. DM at 24. Statements are not measured by their literal truth, but their ability to accurately inform rather than mislead investors. *See Innocoll*, 2020 WL 1479128, at *15 ("Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead

21

investors."). Defendants' reliance on this Court's decision in *In re Viatris Inc. Sec. Litig.* is misplaced. 2024 WL 4252060, at \*13 (W.D. Pa. Sep. 20, 2024). There, the Court did not rule that literally true statements that mislead are inactionable. *Id.* Instead, the Court found that the complaint failed to plead a plausible basis for falsity in context. *Id*.

Defendants' attempt to disclaim responsibility for the misrepresentations they made to analysts from Barclays and UBS also fails. DM at 25. The statements were indisputably made on behalf of Viatris, so Viatris is their maker. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 705 (9th Cir. 2021) (holding that corporation has "ultimate authority" over its own statements). The statements were also made on behalf of Smith and Mistras. The Barclays report attributed the statements to "management," and as the most senior officers of the Company, the Individual Defendants had authority over these communications. *See In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2023 WL 9748644, at \*33-34 (D.N.J. May 22, 2023) (finding that the CEO and CFO had "ultimate authority" over investor communications); *see also In re Dentsply Sirona, Inc. Sec. Litig.*, 816 F. Supp. 3d 449, 477-78 (S.D.N.Y. 2026) (finding that defendant was the maker of statements attributed to "management" in analyst report). Likewise, the surrounding circumstances establish that the Individual Defendants were the makers of the statements made to analysts. *Id.* The statements related to the same subject that the Individual Defendants personally spoke about at the same time. ¶¶196-197. Defendants' suggestion that the most senior officers of the Company were uninvolved in approving external statements about one of the most important issues related to Viatris's business requires the Court to check its "disbelief at the door." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020).[5]

---

[5] *See also* Viatris Code of Business Conduct and Ethics, *available at* https://www.viatris.com/-/media/project/common/viatris/pdf/corporate-governance/the-code-of-business-conduct-and-

Defendants also raise flimsy factual disputes about the falsity of certain statements. DM at 25 n.16. While inappropriate on a motion to dismiss, their arguments fail on the merits too. Viatris did not merely identify the publicly disclosed exceptions, but discussed them in a conversation related to key products impacted by the Warning Letter. ¶200. That placed the undisclosed facts about lenalidomide "in play," *see Dickinson*, 620 F. Supp. 3d at 188, and created an affirmative duty of full disclosure. DM at 25. Defendants' claim that false statements made on a company's website are beyond the reach of the securities laws is also incorrect. DM at 25 n.16; *see Howard v. Arconic Inc.*, 2021 WL 2561895, at *15 (W.D. Pa. June 23, 2021) (collecting cases); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) (explaining that the market price of securities reflects all publicly available information).

**C. Defendants Cannot Recast Their Misrepresentations as Puffery, Inactionable Opinions, or Predictions**

***Actionable Corporate Optimism.*** Whether a statement is puffery depends entirely on context. *See Bishins v. Marinus Pharms., Inc.*, 2026 WL 686766, at *16 (E.D. Pa. Mar. 11, 2026). Defendants' attempt to paint most challenged statements as so insignificant that no reasonable investor would rely upon them ignores the statements' context, and trivializes cGMP requirements and laws intended to keep drugs safe and effective. DM at 19-20. Courts have rejected this argument in cases involving cGMP violations or other critical aspects of drug production. *See In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*, 2019 WL 1299673, at *17 (D.N.J. Mar. 21, 2019) (ruling that compliance with cGMP is capable of objective verification); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *16 (D.N.J. Dec. 27, 2019) (concluding that statements concerning quality were

---

ethics.pdf (prohibiting all Viatris personnel from "provid[ing] any Viatris-related information to media representatives or other outside parties without the advance approval of Global Communications.").

23

actionable); *see also ImmunityBio*, 753 F. Supp. 3d at 1062 (explaining that statements about quality oversight and manufacturing capacity misled investors to believe that the defendant was cGMP compliant); *Patel v. Koninklijke Philips N.V.*, 2024 WL 4265758, at *10-11 (E.D.N.Y. Sep. 23, 2024) (similar with respect to compliance with FDA regulations).[6]

In a section nominally about "opinions," Defendants relitigate puffery. They omit words like "stable" from the context of their misrepresentation that a portfolio of 4,400 products insulated Viatris from any single product's loss, but ignore that statement was objectively false when made because the loss of lenalidomide alone would substantially harm the Company's financial results. DM at 21 (citing ¶¶187-190). These statements are actionable precisely because context gives them concrete, verifiable meaning. *See Baxter v. MongoDB, Inc.*, 2026 WL 1192420, at *23 (S.D.N.Y. Apr. 30, 2026) (finding that "stable" and "steady" were misleading in context). And the market's reaction confirms this point: analysts understood the statements exactly as alleged, coming away "confident" that Viatris's growth was "sustainable into 2025." ¶191. Materiality is measured by what a reasonable investor considers important to an investment—not snippets a defendant selectively isolates after the fact. *See Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000). The same analysis applies to the misleading statement that Viatris was undervalued because of the

---

[6] Except for *Mylan*, none of Defendants' puffery cases concern cGMP violations. 2023 WL 3539371, at *10-11. *See, e.g.*, *Viatris*, 2024 WL 4252060, at *11 (analyzing statements related to company's position in the industry). *Mylan*'s puffery analysis is against the weight of authority, but even there, the court found some statements similar to Viatris's May 2024 statement here affirming cGMP compliance actionable because of violations identified in a Form 483. 2023 WL 3539371, at *15-16. Defendants also rely on irrelevant cases concerning codes of conduct and ethical aspirations. *See Singh v. Cigna Corp.*, 918 F.3d 57, 63-64 (2d Cir. 2019); *In re Exscientia P.L.C. Sec. Litig.*, 2025 WL 2886489, at *12 (D.N.J. Oct. 10, 2025). Other cited authorities directly contradict Defendants' misstatements of the law. *See In re Lottery.com, Inc. Sec. Litig.*, 765 F. Supp. 3d 303, 341 (S.D.N.Y. 2025) (statement about acting "in accordance with applicable laws" found actionable); *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *10 (W.D. Pa. Sep. 8, 2017) (same concerning managing regulatory risk).

stability of its generic business. *See In re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 48-49 (2d Cir. 2025) (holding that statements concerning a company's valuation were actionable misrepresentations).

Regardless, Defendants are liable even if any misrepresentation could be characterized as loosely optimistic. The misrepresentations were made despite Defendants' undisputed knowledge of Viatris's failure to comply with cGMP. *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173-74 (2d Cir. 2020) (holding that puffery is actionable when the speaker knows the opposite is true); *In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at *13-14 (D.N.J. Dec. 15, 2015) (similar).

***Misleading Purported "Opinions."*** Defendants' attempt to mischaracterize misrepresentations of fact as "opinions" should be rejected. Some statements do not even contain the words "believe" or "think." ¶187 ("[N]ot one product in any one geography really changes the needle."); ¶189 ("Number one, it's what we've talked about, the kind of stability that we've kind of seen in the base business . . ."). *See In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2015 WL 2250472, at *11 n.7 (D.N.J. May 13, 2015) (ruling that "direct assertions" are not opinions). And even if certain statements are construed as opinions, liability still attaches because: (1) the belief was not sincerely held, (2) the statements contained embedded misrepresentations of fact, and (3) the statements omitted material facts that undermined the opinions. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188-92 (2015).

Defendants' nonpublic concessions to the FDA, and their knowledge of the lenalidomide market and relevant regulations show that they did not sincerely believe the views they expressed publicly to investors—particularly about the availability of exemptions. *Compare* ¶273 *with* DM at 28-35; *see also Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2022 WL 17740482, at *8 (D.N.J. Dec.

16, 2022) (awareness of facts that contradicted misrepresentations was sufficient to show belief was not sincere). Accordingly, this Court's *Viatris* decision is distinguishable. 2024 WL 4252060, at *11.

Defendants' statements fare no better under the other two *Omnicare* prongs, because the statements embedded misrepresentations of fact and conflicted with known, materially adverse information about lenalidomide. *See, e.g.*, ¶187 (stating that "not one product" "really changes the needle."); *see In re Maiden Holdings, Ltd. Sec. Litig.*, 153 F.4th 354, 364-65 (3d Cir. 2025).

Defendants again retreat to a test of literal accuracy, but that is not the measure of falsity. *See supra* at 21-22. Neither is Defendants' ability to anticipate the exact consequences in advance. DM at 22; *see supra* at 19. Nor must statements expressly mention regulatory compliance or lenalidomide. *See Innocoll*, 2020 WL 1479128, at *12-13 (rejecting argument that misrepresentations must directly relate to specific issues raised by the FDA). And unlike in *Viatris*, Defendants had no "reasonable basis" to make their misleading statements. 2024 WL 4252060, at *11.

***Unprotected, Knowingly False Statements.*** The safe harbor does not apply to the non-forward-looking part of a mixed statement or to omissions of existing fact. *See Frater*, 996 F. Supp. 2d at 348; *Alberici v. Recro Pharma, Inc.*, 2021 WL 798299, at *9 (E.D. Pa. Mar. 1, 2021). Moreover, purported "cautionary language" cannot protect a defendant from misrepresenting present facts. *In re Cell Pathways, Inc.*, 2000 WL 805221, at *11 (E.D. Pa. June 20, 2000) (collecting cases).

Here, the misrepresentations Defendants contend are entitled to safe harbor protection hinge on non-forward-looking assertions. For example, Defendants discuss their then-present understanding of the FDA process, *see, e.g.*, ¶194 ("[t]here could be the potential for additional

26

exceptions based on further discussions with the [FDA]"). But "beliefs about the FDA approval process" are not forward-looking. *Frater*, 996 F. Supp. 2d at 348; *see also* ¶196 (misrepresenting that "we're not in a position right now to disclose specific products."). Thus, the decision to hide that lenalidomide was manufactured at Indore and therefore subject to the import ban is not protected by safe harbor. *See Viropharma*, 21 F. Supp. 3d at 471.

But even if any part of a statement related to the future, the statement is still not entitled to safe harbor protection because Defendants do not point to specific meaningful cautionary language. *Compare* DM at 26-27 (citing exhibits without identifying even one cautionary statement), *with Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, 660 F. Supp. 1362, 1368 n.5 (D. Conn. 1987) (refusing to address the bespeaks caution doctrine because defendants failed to point to any cautionary language); *Innocoll*, 2020 WL 1479128, at *17-18 (declining to examine unspecified cautionary statements). And the exhibits Defendants cite largely contain irrelevant information or discuss boilerplate risks that can apply to any pharmaceutical company. *Compare* Defs.' Ex. 21 at 2 (addressing general "changes in or difficulties with the Company's manufacturing facilities") *with Innocoll*, 2020 WL 1479128, at *17 (explaining that "courts have rejected the alleged significance of boilerplate warnings true to every company that interacts with the FDA"). Cautionary language must be specific, extensive, and tailored to the issue at hand to be considered meaningful. *See In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at *15 (D.N.J. Dec. 19, 2019). Defendants make no attempt to meet this requirement. Moreover, any "cautionary language" was itself misleading, given Defendants' failure to update the disclosures, despite the serious issues that the FDA had identified at Indore. *See supra* at 19-20. Defendants' safe harbor arguments fail for this reason alone. DM at 26-28.

Moreover, the safe harbor is inapplicable because Defendants made the misrepresentations

27

with actual knowledge. *See* §V. Their suggestion that pleading this element is nearly impossible is false. DM at 27 n.18. A defendant's awareness of facts that render a statement misleading is sufficient to show actual knowledge. *See In re Coinbase Glob., Inc. Sec. Litig.*, 2025 WL 2779024, at *12 (D.N.J. Sep. 30, 2025); *Forescout*, 63 F.4th at 781; *Gimpel v. Hain Celestial Grp., Inc.*, 156 F.4th 121, 147-48 (2d Cir. 2025) (similar). Indeed, Defendants concede actual knowledge by failing to challenge that they knew lenalidomide was not subject to any shortage, and therefore could not qualify for an exemption—which rendered their statements about only a "little bit of headwind" materially false and misleading. *Compare* ¶¶196, 273 *with* DM at 28-35. Defendants improperly go outside the Complaint to argue that other drugs received exemptions despite no indication of a shortage in the FDA and ASHP databases. DM at 27-28. At best, this creates an issue of fact for trial. Even there, Defendants will not prevail because federal law controls when an exemption applies, and Defendants do not contest the other reasons that lenalidomide was ineligible for an exemption, including Bristol-Myers' far larger market share and ability to fully supply the market.

For all of these reasons, Plaintiffs sufficiently plead that Defendants made false and misleading statements, and adequately explain why they were false and misleading.

## V.     THE COMPLAINT PLEADS A COMPELLING INFERENCE OF SCIENTER

Deliberate recklessness is sufficient to plead scienter. *Dickinson*, 620 F. Supp. 3d at 193 n.25. Awareness of facts that render a statement misleading demonstrates deliberate recklessness. *Id.*; *Odeh*, 2020 WL 4381924, at *7 (same). An inference of scienter "need not be irrefutable . . . or even the most plausible," and Plaintiffs are not required to provide a "smoking-gun." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). The test is simply whether a reasonable person would "deem the inference of scienter cogent and at least as compelling as any

opposing inference one could draw from the facts alleged." *Id*.  A tie goes to the Plaintiffs.  *See Lormand*, 565 F.3d at 254.  Here, Plaintiffs plead a particularly strong inference of scienter based on Defendants' own internal documents.  That evidence, taken collectively with the additional facts alleged in the Complaint, gives rise to a strong inference that Defendants acted with scienter.

Contrary to Defendants' mischaracterizations of the law, the Complaint is not required to plead motive, confidential witness accounts, or internal reports.  *See Avaya*, 564 F.3d at 268-69, 276-77; *Trevena*, 482 F. Supp. 3d at 334-35; *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *16 n.22 (D.N.J. Aug. 28, 2017).  Nor are Plaintiffs required to plead stock sales.  DM at 23-24, 28-29.  *See In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *11 (D.N.J. Apr. 28, 2017); *City of Warwick Ret. Sys. v. Catalent, Inc.*, 2024 WL 3219616, at *13, 15 (D.N.J. June 28, 2024).  Indeed, stock sales are irrelevant here because Plaintiffs do not—and need not— rely on motive to plead scienter.  *Id*.[7]

***Uncontested Allegations of Scienter.***  Defendants also fail to address several factors that on their own support scienter.  *See Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) (failure to address an argument results in waiver).  Defendants do not address that Viatris was told about the OAI designation no later than October 2024—yet Defendants continued to make misleading statements.  ¶¶88-89, 182-186, 260; *Hall*, 2019 WL 7207491, at *22 ("[F]ailure to disclose the contrary information of which [defendant] was allegedly aware is suggestive of scienter").  Similarly, Defendants do not deny their knowledge of all the information necessary to understand that lenalidomide was ineligible for an

---

[7] Defendants' authorities are likewise inapposite.  In each, unlike here, the plaintiffs attempted to plead scienter based on motive.  *See* DM at 29-30 (citing inapposite cases)*.*  Further, to the extent that *In re Adolor Corp. Sec. Litig.* suggests that courts should draw a negative inference from an absence of motive, that ruling is inconsistent with both *Tellabs* and Third Circuit precedent.  616 F. Supp. 2d 551, 571-76 (E.D. Pa. 2009).  *See Avaya*, 564 F.3d at 268-69, 276-77.

exemption. ¶273; *Hall*, 2019 WL 7207491, at \*22.[8]  Defendants' own letters show that high-level

Viatris employees agreed with the FDA's finding of cGMP violations, and knew that it would take

the Company months to remediate those violations—contradicting Defendants' arguments to the

contrary.  ¶¶241-246; DM at 15, 34-35.[9]  Defendants offer no explanation for why they purged

Indore's leadership following receipt of the June 2024 Form 483, or for the fact that the issues

were so serious that they suspended product releases from the facility.  ¶¶251-256; *see W. Palm*

*Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at \*17 (E.D. Pa. June 16,

2015) (departure of executives responsible for failed procedures bolstered scienter).

While denying clear admissions of knowledge, Defendants are silent about Smith's public

concession during the Class Period that he was "***in close communication with the FDA*** and

receiv[ed] initial FDA feedback ***some months ago***."  ¶¶196, 261; *see also* ¶261 (Mistras admitting

to "ongoing discussions . . . with the FDA.").  Defendants also fail to address their subsequent

admission to an analyst that ***as early as June 2024***, Viatris understood the severity of the issues at

---

[8] Defendants' passing reference to their "general familiarity with regulations" does not adequately address these allegations. *See Foster*, 26 F.3d at 398.  Defendants are also wrong.  Courts in this Circuit have repeatedly found that a defendant's awareness of FDA guidance and regulations can support scienter. *See*, *e.g.*, *Celgene*, 2019 WL 6909463, at \*17 (FDA guidance put defendants on notice that their statements were false); *Innocoll*, 2020 WL 1479128, at \*11-14 (similar).

[9] As discussed in §IV(A), Defendants' contention that they could make false statements and conceal material information from investors, so that they could keep quiet their attempts to fix the deficiencies, is unsupported by the law. *See Matrixx*, 563 U.S. at 48-49 n.15.  The out-of-Circuit cases Defendants cite do not help them.  In *Genzyme*, the issues were not serious or pervasive, and the company was transparent with investors.  754 F.3d at 42-45.  Here, Defendants privately admitted to serious cGMP violations in communications with the FDA, admitted that they could not be rectified until 2025 (¶75), secretly suspended exportation (¶¶79, 96), and concealed adverse information until they were ***forced*** to disclose it because the FDA publicly released the Warning Letter before Defendants did. *Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.* is distinguishable on the same grounds.  679 F.3d 952, 954-55 (7th Cir. 2012); *see also Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 839-40 (N.D. Ind. 2018) (distinguishing *Plumbers*).

Indore, and that remediation of at least some deficiencies would be "challenging." *Id.* These allegations are more than enough to plead a compelling inference of scienter. *See Avaya*, 564 F.3d at 269 (holding that the most powerful evidence of scienter was the content and context of defendants' own statements); *see also In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *9-10 (N.D. Cal. Nov. 4, 2020) (post-class period admission that defendants had known of potential risks bolstered scienter); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491-92 (S.D.N.Y. 2004) (similar).

    ***Access to and Receipt of Contradictory Information.*** Mere access to information inconsistent with a defendant's statement is sufficient to plead scienter; actual receipt is not required. *See Innocoll*, 2020 WL 1479128, at *12; *Viropharma*, 21 F. Supp. 3d at 473 (similar).

    Defendants do not dispute their access to: (a) FDA Guidance (¶¶38-56, 270); (b) Viatris's internal audit identifying the deficiencies at Indore in January 2024 (¶¶239-240); (c) the status of remediation efforts due to the direct line of reporting between Smith and the CQO (¶¶247-250); (d) the June 2024 Form 483 (¶¶251-256); and (e) their own nonpublic communications with the FDA (¶¶257-264). Indeed, Defendants ignore that they had already told the FDA that the Company's management was involved at the highest level. Defendants promised the FDA that "[c]orporate leadership and senior management [was] committed to staying closely involved in the remediation" efforts. ¶¶242-243. In *Celgene*, the court found that ***Defendant Smith***, who was then Celgene's President and Chief Operating Officer, acted with scienter because a key executive with relevant insight directly reported to him. 2019 WL 6909463, at *21. The Court should find the same here because the CQO, whom the Company said would oversee remediation, directly reported to Smith. ¶243.

    In any event, the Complaint pleads that Defendants not only had access to, but ***actually***

31

*received* adverse information.  And Defendants' nonpublic correspondence with the FDA shows that they agreed with the FDA's findings.  ¶¶53, 57-118, 239-250, 257-264.[10]  In particular, the October 30, 2024 letter admits that Viatris had known about the data integrity violations since January 2024, and that the violations were directly related to what the FDA discovered in June 2024.  ¶¶57, 95.  Smith and Mistras also admitted to an analyst that addressing some of the deficiencies would be "challenging."  *Supra* at 30-31; ¶261.  Along with the Warning Letter (¶110), these facts are more than sufficient to plead a compelling inference of scienter in this Circuit.  *See, e.g.*, *In re Able Lab'ys Sec. Litig.*, 2008 WL 1967509, at *16 (D.N.J. Mar. 24, 2008) ("The Form 483 and the warning letter provided notice to the defendants that serious problems existed in the manufacturing process at Able"); *Odeh*, 2020 WL 4381924, at *7 (same, concerning *data integrity violations*); *Patel*, 2024 WL 4265758, at *6 (similar).  Defendants' authorities all lacked specific facts to plead access to or possession of contradictory information, and therefore are distinguishable.  *See* DM at 29-30.

   ***Content and Context of Defendants' Statements.***  Defendants held themselves out as knowledgeable about the deficiencies at Indore and lenalidomide's place in Viatris's drug portfolio.  ¶272.  Courts in this Circuit have repeatedly found that similar allegations supported a finding of scienter.  *See Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 228-29 (E.D. Pa. 2021) (collecting cases); *see also Novo*, 2026 WL 2168296, at *23 (finding scienter where the executive spoke with familiarity on the subject, and provided analysts with "direct responses" to their questions which "implied that [he] had first-hand knowledge" of the "key issue").  And contrary to Defendants' contention that their own statements admitting

---

[10] Plaintiffs are not "speculat[ing]" about Defendants' post-Form 483 communications with the FDA, DM at 31, but instead *quote Defendants' own letters to the FDA* concerning the Form 483. ¶¶241-246.

knowledge should be disregarded as "must have known" allegations, DM at 32, "the most powerful evidence of scienter is the content and context of [the] statements themselves." *Avaya*, 564 F.3d at 269; *see also Dickinson*, 620 F. Supp. 3d at 195-96.

Defendants' responses to analyst questions about the issues at Indore and Viatris's communications with the FDA strengthen the inference of scienter. *See, e.g.*, ¶¶187, 189, 196; *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 561 (D.N.J. 2024) (collecting cases) (finding responses to specific analyst questions without qualification supported scienter). This is especially so given Defendants' mischaracterizations of negative FDA feedback, and their refusal to disclose specific products that were negatively impacted at Indore. ¶196; *Frater*, 996 F. Supp. 2d at 349-50 (finding scienter where defendants conveyed FDA feedback to investors). Defendants' reliance on *In re Amarin Corp. PLC Sec. Litig.* is misplaced. 2021 WL 1171669, at *18 (D.N.J. Mar. 29, 2021). There, the defendants did not directly address the specific issues or speak on the pertinent topic at length, as Defendants did here. *Id.* at *3.

***Core Operations.*** Misrepresentations about matters fundamental to a company's business may contribute to an inference of scienter when combined with other facts. *See Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *16 (D.N.J. July 31, 2019); *Gorlamari*, 2024 WL 150341, at *9; *Dickinson*, 620 F. Supp. 3d at 196. In addition, "[a]llegations that fraud related to a high-earning segment of a company have been found sufficient to support" scienter. *Id.*; *see also Catalent*, 2024 WL 3219616, at *13 & n.23, 15.

Data integrity and the production of a high-margin product like lenalidomide that impacted Viatris's revenues plainly support a core operations inference. ¶¶221, 271; *see Avaya*, 564 F.3d at 270-71 (holding that importance of margins contributed to a finding of scienter); *Odeh*, 2020 WL 4381924, at *8 (similar, concerning data integrity violations and Form 483s). Defendants' attempt

33

to minimize the financial impact on Viatris from the loss of lenalidomide fails even if their self-serving narrative is credited. DM at 34. Courts in this Circuit have applied the core operations inference to single digit percentage declines in revenues and earnings. *See Energy Transfer*, 532 F. Supp. 3d at 232-33 (applying the core operations inference to a $500 million impact when the company's EBITDA was $11.2 billion). Analyst reaction also belies any assertion that the impact on Viatris was insignificant. *See, e.g.*, ¶221 (expecting to see some degree of impact into 2026); ¶223 (correctly questioning why Defendants failed to disclose the impact on lenalidomide when they first discussed the Warning Letter); ¶224 (concluding that guidance for 2025 came in below expectations "largely due" to the setbacks at Indore); ¶227 (explaining how the loss of lenalidomide was "especially discouraging" because of the limitations on revenue from that drug in 2026 and beyond). And unlike in the cases cited by Defendants, Plaintiffs do not contend that the core operations doctrine alone supports scienter. DM at 33-34; *see, e.g.*, *Hoey v. Insmed Inc.*, 2018 WL 902266, at *22-23 (D.N.J. Feb. 15, 2018); *Thomas v. Shiloh Indus., Inc.*, 2017 WL 1102664, at *4 (S.D.N.Y. Mar. 23, 2017).

   ***Defendants' Competing Inferences are Speculative, Irrelevant and Implausible.*** Unable to explain why they concealed material information from investors, Defendants invent facts that contradict both the law and the Complaint. DM at 34-35. Defendants did not promptly disclose anything. *See Todd*, 2016 WL 6699284, at *12-14 (finding that defendants' choice to conceal negative FDA feedback, a Form 483, and a warning letter until after the FDA published the warning letter was "telling"). Accordingly, *Genzyme*, where the defendants promptly disclosed negative events throughout the class period, is distinguishable. 754 F.3d at 42-45; *see also Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 244-45 (1st Cir. 2015) (similar).

   Defendants' unsupported assertions that they believed the June 2024 Form 483 was

34

insignificant or that the deficiencies were easily correctable cannot be reconciled with Defendants' nonpublic communications with the FDA. *Compare* DM at 34 *with e.g.*, ¶75 (stating that target date for taking corrective action was January 15, 2025); ¶91 (admitting that testing data at Indore was fabricated). Further, assumptions about Defendants' subjective, incorrect beliefs concerning remediation are irrelevant to whether Defendants were reckless. *See Cell Pathways*, 2000 WL 805221, at *8 (disregarding subjective beliefs about the success of a clinical trial). Defendants' claim that they needed additional time to assess whether lenalidomide qualified for an exemption does not withstand scrutiny since Defendants do not deny knowing all the facts necessary to conclude that there was no reasonable basis to seek an exemption in the first place. ¶273.

Finally, contrary to Defendants' mischaracterizations of the Complaint, Plaintiffs are "not arguing—no matter how many times Defendants say the opposite [DM at 35]—that Defendants knew" the precise consequences of their actions in advance. *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 4208442, at *8 (S.D.N.Y. July 21, 2020). Rather, the Complaint's well-pleaded allegations show that Defendants knew facts and had access to information that rendered their public statements to investors false and misleading when made. *Id*. That is classic securities fraud.

## VI.    PLAINTIFFS ADEQUATELY ALLEGE SECTION 20(a) VIOLATIONS

Because the Complaint adequately pleads primary violations of §10(b), Plaintiffs' control person claims should be sustained. *See Cell Pathways*, 2000 WL 805221, at *12.

## VII.   CONCLUSION

For these reasons, Defendants' motion should be denied in full. Should the Court find any part of the Complaint wanting in any respect, Plaintiffs respectfully request leave to replead. *See Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 576 (W.D. Pa. 2019).

35

DATED: August 3, 2026          **POMERANTZ LLP**

                                        */s/ Omar Jafri*
                                        OMAR JAFRI

Omar Jafri (*pro hac vice*)
Christopher P.T. Tourek (*pro hac vice*)
Jianan Jiang (*pro hac vice*)
10 South LaSalle, Suite 3505
Chicago, IL 60603
Telephone:  312/377-1181
ojafri@pomlaw.com
ctourek@pomlaw.com
ajiang@pomlaw.com

**ROBBINS GELLER RUDMAN
   & DOWD LLP**
ERIN W. BOARDMAN (*pro hac vice*)
JEREMY YOHANNAN (*pro hac vice*)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone: 631/367-7100
eboardman@rgrdlaw.com
jyohannan@rgrdlaw.com

**ROBBINS GELLER RUDMAN
   & DOWD LLP**
ALYSSA PLASCOFF (*pro hac vice*)
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone: 212/432-5100
aplascoff@rgrdlaw.com

*Lead Counsel for Lead Plaintiffs and the Class*

**LAW OFFICE OF ALFRED G.
   YATES, JR., P.C.**
Alfred G. Yates, Jr. (PA 17419)
1575 McFarland Road, Suite 305
Pittsburgh, PA 15216
Telephone:  412/391-5164
412/471-1033 (fax)
yateslaw@aol.com

*Local Counsel for Lead Plaintiffs and the Class*

36